## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AVI ALEXANDER RACHLIN,<br><br>             Plaintiff,<br><br>    -against-<br><br><br>GEORGE K. BAUMANN,<br>Individually and as Chief of Police of<br>the FREEHOLD TOWNSHIP POLICE<br>DEPARTMENT and FREEHOLD<br>TOWNSHIP,<br><br>             Defendants. | HON. FREDA L. WOLFSON,<br>U.S.D.J.<br><br>HON. TONIANNE J.<br>BONGIOVANNI, U.S.M.J.<br><br>CIVIL ACTION NO. 3:21-cv-<br>15343<br><br>**CIVIL ACTION**<br><br>**(ELECTRONICALLY FILED)**<br><br>Motion Date: October 18, 2021 |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR A
## PRELIMINARY AND PERMANENT INJUNCTION

Edward A. Paltzik
JOSHPE MOONEY PALTZIK LLP
1407 Broadway, Suite 4002
New York, NY 10018
Tel: (212) 344-8211
Fax: (212) 313-9478
epaltzik@jmpllp.com

*Attorneys for Plaintiff*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ………………………………………………………… iii

INTRODUCTION …………………………………………………………... 1

BACKGROUND ………………………………………………………… 6

I.    New Jersey's Statutory and Regulatory Scheme Relating to Applications for Firearms Purchase Identification Cards …………......... 6

II.   Plaintiff's Application for a Firearms Purchase Identification Card………………………………………………………..…………. 9

III.  Baumann Imposes a Policy and Demand Requiring Plaintiff to Submit to Screening by a Clinical Psychologist In Order to Obtain a Firearms Purchase Identification Card ……………………………..…………… 12

IV.   Baumann's Ongoing Denial of Plaintiff's Application for a Firearms Purchase Identification Card………………..……..…………………... 16

ARGUMENT……………………………………………………….….... 18

V.    Plaintiff Is Likely To Succeed on the Merits of His Second Amendment Claim ……………………………………………..……... 19

A. Baumann's Policy and Demand Requiring Plaintiff to Submit to Screening by a Clinical Psychologist In Order to Obtain a Firearms Purchase Identification Card, and Denial of Plaintiff's Application for a Firearms Purchase Identification Card, Impose an Ongoing Burden on Plaintiff's Second Amendment Right to Keep and Bear Arms ………………………………………… 21

B. Baumann's Conduct Fails Any Level of Heightened Constitutional Scrutiny ………....................................................... 26

1. At a Minimum, Strict Scrutiny Should Apply ………………… 26

i

      2.  Baumann's Conduct Fails Even Intermediate Scrutiny ….....… 28

VI.   Alternatively, Baumann's Policy and Demand Requiring Plaintiff to Submit to Screening by a Clinical Psychologist In Order to Obtain a Firearms Purchase Identification Card, and Denial of Plaintiff's Application for a Firearms Purchase Identification Card, Are Categorically Unconstitutional Because They Completely Bar Plaintiff from Exercising His Second Amendment Right to Keep and Bear Arms, Despite the Fact that Plaintiff Is Not Subject to Disqualification From Acquiring, Owning, or Possessing Firearms Under New Jersey or Federal Law and Presents No Danger to Public Health, Safety, or Welfare ….................................................. 29

VII.  Plaintiff Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction …………………………………………... 35

VIII. The Balance of the Equities Favors the Grant of Preliminary Injunctive Relief …………………………………................................ 36

IX.   The Court Should Waive the Bond Requirement or Set Bond at a Nominal Amount …………………………………………………… 37

X.    The Court Should Enter Final Judgment Awarding a Permanent Injunction ………………………………………………..…….... 38

CONCLUSION …………………………………………………….... 40

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                          **<u>Page</u>**

*Ass'n of N.J. Rifle & Pistol Clubs Inc. v. AG N.J.*,
    974 F.3d 237 (3d Cir. 2020) …………………………………….………... 26

*Ayotte v. Planned Parenthood of N. New England*,
    546 U.S. 320 (2006) ………………………………….………......... 19, 20

*Baby Tam & Co. v. City of Las Vegas*,
    154 F.3d 1097 (9th Cir. 1998) ………………………………...……….. 38

*Bd. of Trustees of State Univ. of New York*,
    492 U.S. 468 (1989) …………………………………………...……….. 28

*Binderup v. AG of United States*,
    836 F.3d 336 (3d Cir. 2016) …………………………………… 20, 23, 30

*Board of Educ. v. F.C. ex rel. R.C.*,
    2 F. Supp. 2d 637 (D.N.J. Apr. 22, 1998) ………………………….... 37

*City of Los Angeles v. Alameda Books, Inc.*,
    535 U.S. 425 (2002) …………………………………………….…. 29

*Connection Distrib. Co. v. Reno*,
    154 F.3d 281 (6th Cir. 1998) …………………………………....... 36

*Curtis 1000, Inc. v. Suess*,
    24 F.3d 941 (7th Cir. 1994) ………..……….……...…………...……… 38

*DeLeon v. Susquehanna Cnty. Sch. Dist.*,
    747 F.2d 149 (3d Cir. 1984) ………..………..……….……..…......... 38

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)…………………………………..………………… *passim*

*Dream Palace v. County of Maricopa*,
    384 F.3d 990 (9th Cir. 2004) …………………………………....... 38

*Drummond v. Twp. of Robinson*,
    784 F. App'x 82 (3d Cir. 2019) …………………………………………... 22

*Elliott v. Kiesewetter*,
    98 F.3d 47 (3d Cir. 1996) ……………………………………………..…. 37

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) …………………………............ 1, 22, 30, 35

*Getzes v. Mackereth*,
    2013 WL 5882040 (M.D. Pa. Oct. 30, 2013) …………………………….. 38

*Grace v. District of Columbia*,
    187 F. Supp. 3d 124 (D.D.C. 2016) …………………………………..…. 29

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) …………………………………....……... 21

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013) …………………………………………….... 35

*Kickapoo Traditional Tribe of Texas v. Chacon*,
    46 F. Supp. 2d 644 (W.D. Tex. 1999) …………………………………..…. 38

*Lewis v. Kugler*,
    446 F.2d 1343 (3d Cir. 1971) …………………………………………….. 35

*Mai v. United States*,
    952 F.3d 1106 (9th Cir. 2020) ……………………………………………. 33

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014) …………………………………………………..…. 28

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ……………………………………………………. *passim*

*Miller v. Johnson*,
    515 U.S. 900 (1995) ……………………………………………………… 27

*Morris v. District of Columbia*,
    38 F. Supp. 3d 57 (D.D.C. 2014) …………………………………..….. 38

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986) ……..……………………………………………… 2

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) …………………………………..….. 18

*Rhein v. Pryor*,
    2014 U.S. Dist. LEXIS 36305 (N.D. Ill. Mar. 20, 2014) …………...….. 33

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) …………………………………………………..….. 26

*Stokes v. United States DOJ*,
    2021 U.S. Dist. LEXIS 142785 (N.D. Cal. July 30, 2021) …………... 32, 33

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ……………………………..…... 1, 21, 22

*Temple Univ. v. White*,
    941 F.2d 201 (3d Cir. 1991) ………………………………………..….. 37

*United States v. Marcavage*,
    609 F.3d 264 (3d Cir. 2010) ………………………………………..….. 19

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ……………………………………...… *passim*

*United States v. Mitchell*,
    652 F.3d 387 (3d Cir. 2011) …………………………………..….. 19

*Wrenn v. District of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017) ……………………………….. 29, 31, 36, 39

## Constitutions, Statutes and Rules

United States Constitution

U.S. Const. amend. II …………………………………………………… *passim*

United States Code

18 U.S.C. § 922(g) ………………………………………………………… 25

FED. R. CIV. P.

FED. R. CIV. P. 65(a)(2) …………………………………………….... 38

FED. R. CIV. P. 65(c) ……………………………………………….... 37

N.J.S.A.

§ 2C:58-3(b) . . . …………………………………………….............. 6

§ 2C:58-3(c) . . . .………………………………………….... *passim*

§ 2C:58-3(d) . . . …………………………………………….......... 9, 23

§ 2C:58-3(f) . . . ……………………………………………............ 2

§ 2C:39-5(c)(1) . . . …..…………………………………….............. 6

§ 2C:43-6(a)(3) . . . ………………….………………….............. 6

§ 2C:43-3(b)(1) . . . …………………..…………………............... 6

§ 2C:39-10(c) . . . . …………………………………….............. 6

N.J.A.C.

§ 13:54-1.4(a) . . . …………………………………………............. 6

§ 13:54-1.4(d) . . . …………………………………………............. 7

**Other Sources**

Emily P. Terlizzi, M.P.H., and Benjamin Zablotsky, Ph. D., *Mental Health Treatment Among Adults: United States, 2019*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, Centers for Disease Control and Prevention, National Center for Health Statistics, NCHS Data Brief No. 380 (Sep. 2020), available at https://www.cdc.gov/nchs/data/databriefs/db380-H.pdf
. . . …………………………………………………........................................ 24, 25

*APA Poll: Most Americans Have Sought Mental Health Treatment But Cost, Insurance Still Barriers*, AMERICAN PSYCHOLOGICAL ASSOCIATION (2004), available at https://www.apa.org/news/press/releases/2004/05/apa-poll
. . . …………………………………………………........................................ 24

## INTRODUCTION

The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. Const. amend. II. The Second Amendment, as incorporated through the Fourteenth Amendment, prohibits a state or any political subdivision thereof from infringing on this right. *McDonald v. City of Chicago*, 561 U.S. 742 (2010). This guarantee includes the right to possess firearms for self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008). Necessary to the exercise of this fundamental right is the ability to acquire firearms in the first place. *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)) (the "Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms.").

In New Jersey, though, the Constitutional right to possess firearms for self-defense is far from guaranteed; law-abiding citizens like Plaintiff, Avi Alexander Rachlin ("Plaintiff" or "Rachlin"), who wish to acquire rifles or shotguns must first obtain a Firearms Purchase Identification ("FID") card. N.J.S.A. § 2C:58-3(b). Notwithstanding this obstacle, persons not subject to any of eight "disabilities" set forth in N.J.S.A. § 2C:58-3(c) are entitled to approval of their application and issuance of an FID card. N.J.S.A. § 2C:58-3(c); N.J.S.A. § 2C:58-3(d).

1

In October 2020, Rachlin submitted his application for an FID card to his issuing authority, Defendant George K. Baumann ("Baumann"), Chief of Police of the Freehold Township Police Department (the "FTPD"), a municipal subdivision of Defendant Freehold Township (the "Township"). *See* Declaration of Plaintiff dated September 21, 2021 at ¶ 5 ("Rachlin Decl."). Baumann is the highest official in the Township responsible for setting and enforcing policy with respect to FID cards, since, as the Chief of the FTPD, Baumann has final decision-making authority over FID card applications. N.J.S.A. § 2C:58-3(d). Thus, his unconstitutional conduct, policies, and demands with respect to FID cards as set forth hereinafter are official policies of the Township. *See e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

Rachlin fully and truthfully complied with all requirements of the FID card application process. Nonetheless, in March 2021, following an unlawful processing delay,[1] and even after Baumann verbally approved Rachlin's application for an FID card, Defendants began enforcing a policy and demand against Rachlin requiring that he also be screened by a clinical psychologist at his own expense, and moreover, that his application would be denied unless and until he provides Defendants with a

---

[1] The issuing authority shall grant an application for an FID card "unless good cause for the denial thereof appears, shall grant the [FID card] . . . within 30 days from the date of the receipt of the application for residents of this State . . . ." N.J.S.A. § 2C:58-3(f).

letter from the clinical psychologist stating that issuance of an FID card to Rachlin "will not cause any safety issues to [himself] or the general public," thus compelling Rachlin to commence this action in order to vindicate his Second Amendment right to keep and bear arms. *See* Complaint in this action dated August 16, 2021, attached as Exhibit 1 to the accompanying Declaration of Edward A. Paltzik dated September 21, 2021 ("Paltzik Decl."); Letter from Baumann to Rachlin dated March 4, 2021, attached as Exhibit 2 to the Paltzik Decl.; Rachlin Decl. at ¶¶ 21, 22. Although Rachlin made reasonable efforts to accommodate this unconstitutional policy and demand—he even obtained a letter from a licensed professional counselor confirming that Rachlin was not a danger to himself or others—his efforts did not satisfy Baumann. *See* Letter from licensed professional counselor Jordan Faiman ("Faiman") dated March 19, 2021, attached as Exhibit 3 to the Paltzik Decl.; Letter from Baumann to Rachlin dated March 19, 2021 rejecting Faiman's March 19, 2021 Letter, attached as Exhibit 4 to the Paltzik Decl.; Rachlin Decl. at ¶¶ 24-26, 29-30. Accordingly, Defendants denied Rachlin's application for an FID Card and informed Rachlin that he would not be eligible to receive an FID card until he complied with their policy and demand for clinical psychological screening. *See* automated email from the online New Jersey Firearms Application & Registration Systems ("FARS") to Plaintiff entitled "Firearms Purchaser Identification Card and/or Handgun Purchase Permit Application – Status Update" dated March 26, 2021, attached as

3

Exhibit 5 to the Paltzik Decl.; Letter from Bauman to Rachlin dated March 26, 2021, attached as Exhibit 6 to the Paltzik Decl.

Rachlin is a 20-year-old resident of the Township and is a student in good standing enrolled in The Pennsylvania State University. Rachlin Decl. at ¶ 1. He has never been convicted of a crime, has never been arrested, has never been involuntarily committed or confined to any mental or psychiatric institution, has never been adjudicated by a court or any other tribunal as a mental defective or as a danger to himself or others, has never suffered from a legal disability to possess and acquire firearms, and does not use illegal drugs or abuse alcohol. *Id.* at ¶¶ 6, 38. Rachlin is simply a law-abiding citizen who desires to exercise his fundamental, individual right to acquire and possess firearms for self-defense. However, because of Baumann's prior and continuing enforcement of their policy and demand, Rachlin cannot exercise his Second Amendment rights without running afoul of New Jersey's various criminal laws regulating firearms and related conduct, violations of which carry severe penalties including imprisonment and the lifetime loss of his Second Amendment rights—laws also enforced by Baumann and his FTPD.

As the Supreme Court clearly established and commanded in *Heller*, if a person is not disqualified from exercising his right to keep and bear arms protected under the Second Amendment, the government must permit the person to acquire and possess a firearm for self-defense in the home. *Heller*, 554 U.S. at 635.  Since

Rachlin is not disqualified from exercising his Second Amendment rights—a fact known to Defendants—and is constitutionally entitled to acquire and possess firearms for self-defense, Baumann's ongoing enforcement of the policy and demand that Rachlin submit to screening by a clinical psychologist, and ongoing denial of Rachlin's application for an FID card, are individually and collectively an unconstitutional ban infringing on Rachlin's right to keep and bear arms for self-defense in the home.

Rachlin is thus entitled to preliminary injunctive relief against Defendants in order to redress Baumann's ongoing deprivation of Rachlin's Second Amendment right to keep and bear arms—which is an official policy of the Township—to wit: a preliminary injunction (1) enjoining and restraining Defendants from denying and continuing to deny Plaintiff's FID card application, (2) enjoining and restraining Defendants from engaging in acts and enforcing their policies, demands, practices, and customs that individually and collectively result in the denial of Plaintiff's FID card and violation of Plaintiff's right to keep and bear arms, including but not limited to Defendants' policy and demand that Rachlin submit to screening by a clinical psychologist in order to obtain an FID card, (3) requiring that Defendants issue Plaintiff an FID card and allow Plaintiff to acquire and possess firearms in accordance with New Jersey law, and (4) to the extent State law formed the basis of Defendants' past and continuing denial of Plaintiff's FID card and right to keep and

bear arms, enjoining and restraining Defendants from continuing to enforce such provisions against Plaintiff.  Moreover, because the claims in this case require no further factual development, permanent injunctive relief is likewise appropriate, to wit: a permanent injunction enjoining and restraining the same conduct.

## BACKGROUND

### I.   New Jersey's Statutory and Regulatory Scheme Relating to Applications for Firearms Purchase Identification Cards

In New Jersey, law-abiding citizens must possess an FID card in order to purchase a rifle or shotgun in.  N.J.S.A. § 2C:58-3(b) ("No person shall . . . receive, purchase or otherwise acquire . . . a rifle or shotgun . . . unless the purchaser, assignee, donee, receiver or holder . . . possesses a valid firearms purchaser identification card . . . ."). "Any person who knowingly has in his possession any rifle or shotgun without having first obtained a firearms purchaser identification card in accordance with [N.J.S.A. § 2C:58-3] is guilty of a crime of the third degree," (N.J.S.A. § 2C:39-5(c)(1)), which carries a prison sentence of three to five years (N.J.S.A. § 2C:43-6(a)(3)), and a fine of up to $15,000 (N.J.S.A. § 2C:43-3(b)(1)).

An applicant must complete the S.T.S. 033 form ("Form 033"), obtainable only "from municipal police departments, State Police stations, and licensed retail firearms dealers.  N.J.A.C. § 13:54-1.4(a); *see also* Form 033, attached as Exhibit 7 to the Paltzik Decl. If the applicant "gives . . . any false information" on Form 033, he "is guilty of a crime of the third degree." N.J.S.A. § 2C:39-10(c).

Form 033 also requires the applicant to disclose sensitive information regarding mental health treatment. Indeed, Item (24) on the Form poses the following question: "Have you ever been confined or committed to a mental institution or hospital for treatment or observation of a mental or psychiatric condition on a temporary, interim, or permanent basis? If yes, give the name and location of the institution or hospital and the date(s) of such confinement or commitment." ("Item 24"). Item 24 contains the choice of a "Yes" box or a "No" box in which to place a check mark. Item (26) on the Form poses the following question: "Have you ever been attended, treated or observed by any doctor or psychiatrist or at any hospital or mental institution on an inpatient or outpatient basis for any mental or psychiatric condition? If yes, give the name and location of the doctor, psychiatrist, hospital or institution and the date(s) of such occurrence." ("Item 26").  Item 26 also contains the choice of a "Yes" box or a "No" box in which to place a check mark.

The applicant must also complete the S.P. 66 form ("Form 66"), thereby waiving the privacy of his mental health records, "including disclosure of the fact that said records may have been expunged," by consenting to their disclosure as part of the application.  N.J.A.C. §13:54-1.4(d); *see also* Form 66, attached as Exhibit 8 to the Paltzik Decl.

7

Notwithstanding these and other burdensome prerequisites to acquiring a rifle or shotgun, "[n]o person of good character and good repute in the community in which he lives, and *who is not subject to any of the disabilities* set forth in this section . . . shall be denied a . . . firearms purchase identification card . . . ." N.J.S.A. § 2C:58-3(c) (emphasis added). The "disabilities" provision of N.J.S.A. § 2C:58-3(c) provides, in pertinent part:

> No . . . firearms purchaser identification card shall be issued: (1) " To any person who has been convicted of a crime, or a disorderly persons offense involving an act of domestic violence . . . .", (2) "To any drug dependent person . . . any person who is *confined* for a mental disorder to a hospital, mental institution, or sanitarium, or to any person who is presently an habitual drunkard;", (3) "To any person who suffers from a physical defect or disease which would make it unsafe for him to handle firearms, to any person who has ever been *confined* for a mental disorder, or to any alcoholic . . . to any person who knowingly falsifies any information on the application form for a . . . firearms purchaser identification card ", (4) "To any person under the age of 18 years . . . .", (5) *"[t]o any person where the issuance would not be in the interest of the public health, safety, or welfare*[],"(6) To any person who is subject to a restraining order issued pursuant to the "Prevention of Domestic Violence Act of 1991," . . . prohibiting the person from possessing any firearm;", (7) "To any person who was adjudicated delinquent for an offense which, if committed by an adult, would constitute a crime and the offense involved the unlawful use or possession of a weapon, explosive or destructive device . . . . ", or (8) "To any person whose firearm is seized pursuant to the "Prevention of Domestic Violence Act of 1991," . . . and whose weapon has not been returned.  N.J.S.A. § 2C:58-3(c).  (Emphasis added).

Otherwise, "[t]he chief of police of an organized full-time police department of the municipality where the applicant resides . . . . *shall* upon application, issue to any person qualified under the provisions of subsection c. of this section . . . a firearms purchaser identification card." N.J.S.A. § 2C:58-3(d) (emphasis added).

## II.   Plaintiff's Application for a Firearms Purchase Identification Card

On October 24, 2020, Rachlin submitted his completed Forms 33 and 66 to the FTPD using FARS.[2] *See* email from FARS to Plaintiff dated October 24, 2020 confirming his successful submission of his application for an FID Card, attached as Exhibit 9 to the Paltzik Decl.; Rachlin Decl. at ¶ 5. Rachlin has never "been confined or committed a mental institution or hospital for treatment or observation of a mental or psychiatric condition . . . ." Exhibit 7; Rachlin Decl. at ¶¶ 6, 38. However, Rachlin, intent on providing full and honest disclosure, checked the "Yes" box for Item 24. Rachlin Decl. at ¶ 11. Rachlin truthfully disclosed that when he was a minor under his parents' care, he received a voluntary mental health check at CentraState Medical Center ("CentraState") in Freehold Township at the request of his parents and was evaluated, cleared, and discharged after three hours. *Id.* at ¶ 11. He candidly provided the following supplemental response to Item 24:

> To the best of my memory, it was 1 time, 4 years ago for a period that lasted 3 hours.  This was at the request of my parents.  I was evaluated at Centra State [sic] where a

---

[2] Since Rachlin submitted his Forms 33 and 66 using the online FARS system, he does not have in his possession exact copies of those documents as they were filed.

> medical professional cleared me and I was discharged. The FTPD transported me in the back of the cruiser. I was not handcuffed or restrained. I do not remember the exact date this occurred. *See* PDF of text file created and saved by Rachlin containing the contents of his responses to Items 24 and 26, attached as <u>Exhibit 10</u> to the <u>Paltzik Decl</u>; <u>Rachlin Decl</u>. at ¶ 11.[3]

This evaluation was entirely voluntary, not for any specific "mental or psychiatric condition" (*See* <u>Exhibit 7</u>), and he was not confined or committed to CentraState. <u>Rachlin Decl</u>. at ¶ 12.

Furthermore, Rachlin, like millions of Americans who voluntarily seek an expert opinion and support, saw a psychiatrist, also while he was a minor and years before submitting his application. *Id*. at ¶ 13. Rachlin received a prescription for Prozac, which he used for less than three months. *Id*. Thus, also with the intention of providing full and honest disclosure, Rachlin checked the "Yes" box for Item 26 and provided the following supplemental response:

> To the best of my memory, it was 1 time, 4 years ago, where I went to a psychiatrist for depression-related issues and prescribed Prozac. I took the drug for less than 3 months. Looking back now I don't think I was actually ever depressed. I have not dealt with any medical professional related to my mental health in over 4 years. I do not remember the exact date this occurred or who the Dr was. <u>Exhibit 10</u>; <u>Rachlin Decl</u>. at ¶ 14.

---

[3] Similarly, Rachlin does not have in his possession exact copies of his supplemental responses to Items 24 and 26 as filed, but preserved his responses in a text file verbatim (<u>Exhibit 10</u>).

These disclosures regarding Rachlin's juvenile medical history were not part of any publicly available record, and Baumann would never have discovered this information but for Rachlin's honesty. <u>Rachlin Decl</u>. at ¶ 15. Outpatient mental health counseling, whether at a hospital or in an office setting, is *not* one of the disqualifying factors set forth in N.J.S.A. § 2C:58-3(c) unless the counseling involves confinement.

On November 7, 2020, Rachlin attended a required fingerprinting appointment. <u>Rachlin Decl</u>. at ¶ 16. The FTPD received Rachlin's fingerprints that same day. *Id.* On November 11, 2020, the New Jersey State Police completed its required background check of Rachlin. *Id.* at ¶ 17. Yet, over the next several months, the FTPD failed to timely process Rachlin's application. *Id.*

Accordingly, on February 8, 2021, Rachlin visited the FTPD headquarters and requested an update on his application. *Id.* FTPD Officer Sean Foley spoke with Rachlin, and rather than update Rachlin on the progress of his application, Officer Foley inexplicably demanded that Rachlin re-submit Form 66. *Id.* Rachlin complied with Officer Foley's unlawful demand. *See* Rachlin's resubmitted Form 66, attached as <u>Exhibit 11</u> to the <u>Paltzik Decl</u>; <u>Rachlin Decl</u>. at ¶ 18. Officer Foley falsely assured Rachlin that the application would be processed within two weeks. <u>Rachlin Decl</u>. at ¶ 18.

On February 23, 2021, Rachlin attended a meeting of the Township Committee and delivered a speech in which he criticized Baumann's police department for the delay in processing Rachlin's application. *Id.* at ¶ 19. After the meeting, two Committee members told Rachlin that they would discuss the application with Baumann. *Id.* Not coincidentally, on Friday February 26, 2021, Baumann finally called Rachlin. *Id.* at ¶ 20. During this call, Baumann told Rachlin that the FID card application was "approved" and "good to go," and that Rachlin should wait a few days and he could then pick up his card. *Id.* Baumann also revealed that, in sum and substance, "we were thinking about requesting that you be screened but ultimately determined your issues were very minor and so long ago." *Id.*

### III. Baumann Imposes a Policy and Demand Requiring Plaintiff to Submit to Screening by a Clinical Psychologist In Order to Obtain a Firearms Purchase Identification Card

However, only a week later, on March 3, 2021, Baumann called Rachlin and reversed course. *Id.* at ¶ 21. Without providing any basis for the about-face, Baumann informed Rachlin that he was now concerned that Rachlin was a danger to himself, and that the prior verbal approval was rescinded. *Id.* Compounding the situation, Baumann imposed a policy and demand upon Rachlin requiring him to obtain "clearance" from a "mental health professional" that Rachlin is not a danger to himself or others. *Id.* When Rachlin asked Baumann why he had changed his mind, Baumann responded: "I'm not arguing with you." *Id.*

The next day, Baumann delivered a letter to Rachlin, writing:

> As per our conversation on March 3, 2021, in order for me to approve you obtaining a NJ Firearms ID card, I am requesting that you get evaluated and screened by a clinical psychologist. I am requiring that you get clearance from that doctor stating that you owning or possessing a firearm will not cause any safety issues to yourself or the general public.
>
> As soon as I receive these assurances, I will be able to approve your application for a NJ Firearms ID Card. Exhibit 2; Rachlin Decl. at ¶ 22.

Obtaining a screening appointment and evaluation from a clinical psychologist can be costly and difficult. Rachlin Decl. at ¶ 23. For example, on March 3, 2021, the same day Baumann called Rachlin to demand that he submit to screening by a "mental health professional," Rachlin obtained a quote of $2,500.00 from one clinical psychologist for screening services, a sum of money that Rachlin could not afford to spend to acquire his FID and exercise his rights at that time without imposing severe burdens in other areas of financial need. Id.

In spite of the unconstitutional and burdensome nature of Baumann's policy and demand, Rachlin nonetheless made a good faith effort to comply and provide Baumann with further evidence that he was not a danger to himself or others. Id. at ¶ 24. Accordingly, on March 12, 2021, Rachlin met with Faiman, who had counseled Rachlin from 2013 to July 2017 with respect to adolescent frustrations at the request of Rachlin's mother. Id. at ¶ 25. Faiman was thus uniquely well-positioned to

accurately evaluate Rachlin. *Id*. As well, Faiman's professional services were covered by Rachlin's health insurance carrier, which, given the potentially substantial cost of an evaluation by a clinical psychologist, was understandably a significant consideration for Rachlin, a college student. *Id*.

Having evaluated Rachlin, Faiman drafted a letter dated March 19, 2021 summarizing his evaluation findings. Exhibit 3; Rachlin Decl. at ¶ 26. As to Faiman's earlier counseling of Rachlin, Faiman noted that "safety concerns weren't indicated in the original referral." *Id*. Regarding the new evaluation, Faiman wrote:

> . . . I was contacted again by Mr. Rachlin himself, in early March 2021 to discuss and process the matter at hand, including an exploration of the past 4 years since his final therapy session. I am unable to comment on safety concerns over the course of 4 years since this last session, however, based on Mr. Rachlin's description of his success in the later years of high school and ultimate acceptance into secondary schooling, I am able to surmise he has left any prior mental health and/or safety issues in his adolescent/early teenage years.  Further, during the 03/12/2021 tele-counseling session, *I was able to conduct a formal safety assessment with Mr. Rachlin, to which I was able to determine he is not currently a danger to himself and/or others*. In fact, given his current achievements at his secondary school, it seems likely *his future is bright.*  Exhibit 3 (emphasis added).

Rachlin also obtained a certified letter dated March 16, 2021 from Monmouth County Adjuster William R. Bucco, CPM confirming that there were no records of Rachlin having been confined or committed (attached as Exhibit 12 to the Paltzik Decl.); Rachlin Decl. at ¶ 27.

14

While Rachlin was working to satisfy Baumann's unconstitutional policy and demand, Baumann's investigation of Rachlin took another irregular turn when Baumann called Rachlin's mother and claimed he was looking to speak to Rachlin. <u>Rachlin Decl</u>. at ¶ 28. This phone call made little sense given that Baumann had Rachlin's phone number, that he had spoken with Rachlin by phone multiple times, and that Rachlin's mother was not a reference on Rachlin's application. *Id.* This call by Baumann had no apparent purpose other than to intimidate Rachlin and his family. *Id.*

On March 19, 2021, Rachlin submitted Faiman's letter to Baumann. <u>Rachlin Decl</u>. at ¶ 29. That same day, Baumann delivered a letter to Rachlin rejecting Faiman's letter, insisting that Rachlin submit to the unconstitutional requirement of obtaining an evaluation by a clinical psychologist. <u>Exhibit 4</u>; <u>Rachlin Decl</u>. at ¶ 29. This letter stated that:

> On March 4, 2021, I had sent you a letter requesting that you get evaluated and screened by a clinical psychologist in order for me to approve your firearms application. Today, March 19, 2021, I received a letter from Jordan Faiman Licensed Professional Counselor and Approved Clinical Supervisor. Unfortunately, this did not fulfil [sic] my request of being evaluated and screened by a clinical psychologist.
>
> In addition to getting evaluated and screened, I requested a letter from the clinical psychologist to clearly indicate that you owning or possessing a firearms [sic] will not cause any harm to yourself or the general public.

Until I receive these assurances, I will be unable to
approve your application for a NJ Firearms ID card.
<u>Exhibit 4</u>.

Baumann also left a voicemail for Rachlin on March 19, 2021 stating the following:

Good morning Avi, this is Chief Baumann, Freehold
Township Police Department.  Um…the letter I sent you,
you have to be evaluated and screened by a clinical
psychologist.  This guy here is nothing but a professional
counseling services, and he don't have the uh…he is not a
clinical psychologist.  Now, I don't want to just deny your
application I want to be fair here and give you an
opportunity, but what I sent you is not what you gave back
here.  I asked you to go get evaluated and screened by a
clinical psychologist and I need it specifically to say that
you owning a weapon, a firearms [sic], will not cause any
safety issues to yourself or the general public.  Alright, if
you want to give me a call back, 732-294-5137.  I'm also
going to back this up with a letter sent to your house.  Take
care. <u>Rachlin Decl</u>. at ¶ 30.

On the evening of March 23, 2021, Rachlin again appeared before the Township

Committee and delivered a speech in which he sharply criticized Baumann for lack

of accountability and asserted, *inter alia*, that "Chief Baumann is abusing his

power." *Id.* at ¶ 32.

## IV.   Baumann's Ongoing Denial of Plaintiff's Application for a Firearms Purchase Identification Card

Despite the lack of any disqualifying disability in Rachlin's background, on

the morning of March 26, 2021—over *150 days* since Rachlin submitted his FID

card application—Rachlin received an automated email from the FARS system

which stated:

> AVI RACHLIN,
> Confirmation Number: 20298272970
> Application Status: Denied
> Date of Denial: 3/25/2021
> Issuing Police Department: FREEHOLD TWP PD
> [NJ0131600]
> Contact Phone for Issuing Police Department: (732) 294-
> 5139
> Your application for a New Jersey Firearm Purchaser
> Identification Card and/or Permit to Purchase a
> Handgun(s) has been denied by the issuing authority. The
> actual reason for this denial will be made available to you
> from the issuing police department in the form of a letter
> mailed to your residence.
> Exhibit 5; Rachlin Decl. at ¶ 34.

Later that day, Baumann delivered a letter to Rachlin denying his FID card:

> Your Firearms application background investigation has
> revealed potential grounds to deny your application on the
> basis of **Public Health Safety and Welfare**.
>
> In accordance with NJSA 2C:58-3C, you have the option
> of requesting a Pre-Decision Conference with the Chief of
> Police, prior to a final denial of your application.  The
> purpose of this Pre-Decision Conference is to allow you
> the opportunity to bring forth any additional information
> that may change the status of your application from
> potentially being denied.
>
> You are not obligated to have a Pre-Decision Conference,
> and may choose not to meet with the Chief of Police.  If
> you choose not to have a conference, your application
> denial will be finalized.  You will then receive a letter
> acknowledging the denial. Exhibit 6 (emphasis in
> original); Rachlin Decl. at ¶ 35.

Rachlin has not received any further correspondence from Defendants. Rachlin Decl.

at ¶ 36. Even if Rachlin were to re-apply for an FID card, Baumann would surely

continue to enforce the policy and demand that Rachlin undergo costly and unnecessary screening by a clinical psychologist. Exhibit 2; Exhibit 4; Exhibit 6; Rachlin Decl. at ¶ 37.  Regardless of whether or not Rachlin seeks an FID card under his present application, or reapplies, Baumann's deprivation of Rachlin's right to keep and bear arms is ongoing, completely bars Rachlin from exercising his Second Amendment rights, and will continue in the future, absent immediate injunctive relief.  *Id.* at ¶¶ 37, 40, 42.

## ARGUMENT

A plaintiff seeking preliminary injunctive relief must demonstrate (1) a likelihood of success on the merits and (2) a prospect of irreparable injury if the injunction is not granted. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). In addition, "the district court . . . should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.*

Here, all four factors favor this Court granting a preliminary and permanent injunction. Not only did Baumann deny Rachlin's application without basis under New Jersey law or the U.S. Constitution, but Baumann would undoubtedly continue to insist that Rachlin submit to screening by a clinical psychologist even if Rachlin were to reapply for an FID card. In the meantime, Rachlin continues to suffer

irreparable harm every day that this deprivation of his constitutional right to keep and bear arms continues.

## V.    Plaintiff Is Likely To Succeed on the Merits of His Second Amendment Claim

Establishing likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not." *Id*. at 179. Under this standard, Plaintiff's Second Amendment challenge is likely to succeed, and preliminary injunctive relief should issue.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Supreme Court has held that this constitutional provision "protect[s] an individual right to use arms for self-defense," *Heller*, 554 U.S. at 616, and that because "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty," it applies to the States via the Fourteenth Amendment, *McDonald*, 561 U.S. at 778, 791 (2010).

Unlike a facial challenge, an as-applied challenge "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (quoting *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010)); *see also Ayotte v. Planned*

*Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ( ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another." (internal quotation marks omitted)).  The Third Circuit has established "a two-pronged approach to Second Amendment challenges." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). The framework established in *Marzzarella* is applicable not only to facial Second Amendment challenges, but also to as-applied Second Amendment challenges such as the case at bar. *Binderup v. AG of United States*, 836 F.3d 336, 339 (3d Cir. 2016).

Under *Marzzarella*, the two-step test for assessing challenges under the Second Amendment is as follows:

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. [4] If the law passes muster under that standard, it is constitutional. If it fails, it is invalid. *Marzzarella*, 614 F.3d at 89; *see also Binderup*, 836 F.3d at 346.

The first prong is a "threshold inquiry" into whether the challenged conduct is protected by the right to keep and bear arms. *Marzzarella*, 614 F.3d at 89.  Here, the answer to that threshold inquiry is plain: if the Second Amendment protects any conduct, it certainly protects Rachlin's fundamental right to keep and bear arms,

---

[4] Plaintiffs reserve their right to argue in subsequent proceedings that a tiers of-scrutiny approach is never appropriate in Second Amendment cases. *See Heller v. District of Columbia*, 670 F.3d 1244, 1271–85 (D.C. Cir. 2011) (Heller II) (Kavanaugh, J., dissenting).

which necessarily includes the ability to lawfully *acquire* arms in the first place. *See Teixeira*, 873 F.3d at 677. Therefore, Baumann's determinations to condition Rachlin's ability to acquire arms on screening by a clinical psychologist and deny Rachlin an FID card, are unconstitutional under any standard that could conceivably apply, particularly where, as here, there was, and still is, no reasonable factual or statutory basis to find that Rachlin has a mental condition that presents a danger to himself or others.

**A. Baumann's Policy and Demand Requiring Plaintiff to Submit to Screening by a Clinical Psychologist In Order to Obtain A Firearms Purchase Identification Card, and Denial of Plaintiff's Application for a Firearms Purchase Identification Card, Impose an Ongoing Burden on Plaintiff's Second Amendment Right to Keep and Bear Arms**

Neither the text nor history of the Second Amendment nor the Supreme Court's decision in *Heller* divides the right to keep and bear arms, like an onion into a core and various outer layers. The constitutional text simply provides that the "right of the people to keep and bear Arms, shall not be infringed"—full stop. U.S. CONST. amend. II. Nonetheless, in *Heller*, the Supreme Court recognized that the Second Amendment protects the " 'core' . . . right to possess firearms for defense of hearth and home." *Marzzarella*, 614 F.3d at 88. "After *Heller* . . . federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira*, 873 F.3d at 677. This Circuit has acknowledged that its "sister circuits have conducted

such an analysis and their opinions are illustrative." *Drummond v. Twp. of Robinson*, 784 F. App'x 82, 84 n.8 (3d Cir. 2019)(citing *Teixeira*, 873 F.3d at 677). One of these ancillary rights is acquisition of arms in the first place. *Teixeira*, 873 F.3d at 677; *see also Ezell*, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use . . . ."). "As with purchasing ammunition and maintaining proficiency . . . the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira*, 873 F.3d at 677 (citing *Ezell*, 651 F.3d at 704).

The "central" holding of the Supreme Court in *Heller* was "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634. The Second Amendment "elevates above all other interests"—including any interest in unfairly targeting individuals like Rachlin who voluntarily sought mental health counseling—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id* at 635. The Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees,"

*McDonald*, 561 U.S. at 780, and it cannot "be singled out for special—and specially unfavorable—treatment," *id.* at 778–79.

The first step of the *Marzzarella* analysis is straightforward in this case. The challenged actions—Baumann's policy and demand that Rachlin undergo screening by a clinical psychologist in order to obtain an FID card, a demand without basis under New Jersey law or the U.S. Constitution, and Baumann's baseless refusal to issue an FID card to Rachlin—clearly burden Rachlin's Second Amendment right to keep and bear arms in that Baumann prevented, and continues to prevent Rachlin from exercising the right to *any* extent. Indeed, Baumann's conduct imposes more than just a burden on Rachlin's right to keep and bear arms—Baumann's conduct completely deprives Rachlin from exercising his right because Rachlin cannot acquire firearms in the first place without an FID card.

As well, in an as-applied challenge, at *Marzzarella* step one, it is necessary not only to determine whether the challenged action burdens conduct protected by the Second Amendment, but whether the Plaintiff is an individual who is disqualified from asserting his Second Amendment rights in the first place. *Binderup*, 836 F.3d at 387. Here, Rachlin is not disqualified from asserting his Second Amendment rights under any of the provisions of N.J.S.A. § 2C:58-3(c), and thus Baumann "*shall* upon application issue to [Rachlin] . . . a firearms purchaser identification card." N.J.S.A. § 2C:58-3(d) (emphasis added).  Baumann had, and still has, no reasonable

factual basis and no statutory basis to suspect that Rachlin had a mental condition that presents a danger to himself or others.  Thus, Baumann's insistence that Rachlin be evaluated by a clinical psychologist and denial of Rachlin's application for an FID card, were, and remain, unconstitutional impediments to Rachlin's exercise of his right to keep and bear arms.

Even before the highly stressful COVID-19 pandemic, mental health counseling was widely accepted and utilized throughout the United States.  A 2004 poll conducted by the American Psychological Association (the "APA"), revealed that "[n]early half (48%) of American households have had someone see a mental health professional and nine out of 10 Americans say they are likely to consult or recommend a mental health professional if they or a family member are experiencing a problem."[5]  More recently, according to the 2019 National Health Interview Survey conducted by the Centers for Disease Control and Prevention National Center for Health Statistics, in 2019, "19.2% of adults had received any mental health treatment in the past 12 months, including 15.8% who had taken prescription medication for their mental health and 9.5% who received counseling or therapy from a mental health professional."[6]

---

[5] *APA Poll: Most Americans Have Sought Mental Health Treatment But Cost, Insurance Still Barriers*, AMERICAN PSYCHOLOGICAL ASSOCIATION (2004), available at https://www.apa.org/news/press/releases/2004/05/apa-poll

[6] Emily P. Terlizzi, M.P.H., and Benjamin Zablotsky, Ph. D., *Mental Health Treatment Among Adults: United States, 2019*, U.S. DEPARTMENT OF

Undergoing voluntary mental health counseling or evaluation is a common, lawful, and beneficial activity that should be encouraged, not punished and stigmatized through deprivation of constitutional rights by misguided governmental actors who erroneously conflate mental health counseling with dangerousness when, in reality, millions of Americans seek counseling regularly to address a variety of issues that have nothing to do with firearms safety. Moreover, if applicants, who, like Rachlin, have sought or received  consensual mental health counseling in non-confined settings, can face arbitrary denial of FID cards based on fabricated mental health requirements imposed by local law enforcement officials acting as *de facto* mental health professionals, the result will be the creation of an entirely new class of individuals disqualified from firearms possession, contrary to the laws of New Jersey and federal law.[7]

---

HEALTH AND HUMAN SERVICES, Centers for Disease Control and Prevention, National Center for Health Statistics, NCHS Data Brief No. 380 (Sep. 2020), available at https://www.cdc.gov/nchs/data/databriefs/db380-H.pdf

[7] *See* 18 U.S.C. § 922(g). Categories of persons disqualified from exercising Second Amendment rights under federal law include those who are felons, fugitives from justice, "unlawful user[s] of or addicted to any controlled substance", have "been adjudicated as a mental defective or who has been committed to any mental institution", have been dishonorably discharged from the United States Armed Forces, are "subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner . . . .", or have "been convicted in any court of a misdemeanor crime of domestic violence.

In sum, Baumann's conduct imposes an ongoing burden on, and unconstitutional impediment to, Rachlin's exercise of his right to keep and bear arms, which will continue in the future, absent immediate injunctive relief.

## B. Baumann's Conduct Fails Any Level of Heightened Constitutional Scrutiny

### 1. At a Minimum, Strict Scrutiny Should Apply

Even if this Court concludes that Baumann's conduct, and application of N.J.S.A. § 2C:58-3(c) to Rachlin, are not categorically unconstitutional (*see* Section II *infra*), Baumann's conduct must at the least be subjected to the highest level of constitutional scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973); *see also Ass'n of N.J. Rifle & Pistol Clubs Inc. v. AG N.J.*, 974 F.3d 237, 259 (3d Cir. 2020) (Matey, J., dissenting) ("[F]ollowing the direction of *Marzzarella*, strict scrutiny applies to restrictions burdening rights at the core of the Second Amendment."). And the right to bear arms is not only specifically enumerated in the Constitution; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. Applying a lesser standard would relegate the Second Amendment to "a second-class right." *Id*. at 780.

Whatever public safety interest Baumann may claim in conditioning Rachlin's

FID card on screening by a clinical psychologist (and, to be clear, Rachlin maintains that Baumann has no such legitimate public safety interest), Baumann has made no effort to tailor the requirement so as to minimize imposing unnecessary or overly broad restraints—much less to establish "the least restrictive means" of achieving any "compelling" interests—which is the essence of the strict scrutiny test. *Miller v. Johnson*, 515 U.S. 900, 920 (1995). Indeed, Baumann initially instructed Rachlin to obtain a note from a "mental health professional" that Rachlin is not a danger to himself or others. Rachlin did exactly that—he obtained a letter from Faiman (a mental health professional) stating unequivocally that Rachlin was not a danger to himself or others. Yet, rather than accept Faiman's letter, and thus process Rachlin's application in the least restrictive and narrowly tailored manner possible, Baumann insisted that Rachlin incur the substantial cost and difficulty, and submit to the unconstitutional burden of being screened by a clinical psychologist, without any legal basis or factual basis.

In the Second Amendment context, a government actor such as Baumann cannot narrow the channels for exercising the right to keep and bear arms by limiting one's access to the essential instruments of that right in the first place. Moreover, there has been no showing that Rachlin is in any way disqualified from acquiring, owning, or possessing firearms, much less that he is dangerous, so as to somehow justify prophylactically stripping him of his fundamental right to keep and bear arms,

thus rendering the challenged conduct unconstitutional under strict scrutiny.

## 2. Baumann's Conduct Fails Even Intermediate Scrutiny[8]

The lack of meaningful tailoring by Baumann's renders his conduct

unconstitutional not only under strict scrutiny, but even under intermediate scrutiny,

because that test requires at least "a means narrowly tailored to achieve the desired

objective." *Bd. of Trustees of State Univ. of New York*, 492 U.S. 468, 480 (1989).

Even under intermediate scrutiny, a challenged restriction cannot burden

substantially more constitutionally protected conduct than necessary to achieve the

State's interest. *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014). Baumann's

conduct flunks intermediate scrutiny under the very same reasoning. There is no

evidence that Baumann considered less constitutionally restrictive means of

pursuing the same ends. In fact, quite the contrary—even when presented with the

letter from Faiman, Baumann persisted in requiring that Rachlin be screened by a

clinical psychologist. While nakedly suppressing constitutionally protected

conduct, as Baumann did to Rachlin, "is sometimes the path of least resistance,"

intermediate scrutiny's tailoring requirement is designed precisely to "prevent[ ]

the government from too readily sacrificing [constitutional rights] for efficiency."

*McCullen*, 573 U.S. at 486 (brackets and quotation marks omitted). Indeed, even if

---

[8] Because "rational basis" review is unavailable in the Second Amendment context, see *Heller* 554 U.S. at 628 n.27, Plaintiffs' challenge must at a minimum be decided under intermediate scrutiny.

used as a means to purportedly serve the further end of increasing public safety, an attempt to nakedly suppress the acquisition of firearms by law-abiding citizens is "not a permissible strategy . . . ." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016) (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) (Kennedy, J., concurring), *vacated and remanded by Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017).

Baumann simply cannot show, under any tier of scrutiny, how completely barring Rachlin from exercising his Second Amendment right to keep and bear arms is necessary to advance public safety. Plaintiff is therefore likely to succeed on the merits of his Second Amendment challenge.

**VI.    Alternatively, Baumann's Policy and Demand Requiring Plaintiff to Submit to Screening by a Clinical Psychologist In Order to Obtain an Firearms Purchase Identification Card, and Denial of Plaintiff's Application for a Firearms Purchase Identification Card, Are Categorically Unconstitutional Because They Completely Bar Plaintiff from Exercising His Second Amendment Right to Keep and Bear Arms, Despite the Fact that Plaintiff Is Not Subject to Disqualification from Acquiring, Owning, or Possessing Firearms Under New Jersey or Federal Law and Presents No Danger to Public, Health, Safety, or Welfare**

Because Baumann's policy and demand requiring Rachlin to submit to screening by a clinical psychologist, and denial of Rachlin's application for an FID card, completely bar Rachlin from acquiring, owning, or possessing firearms, Baumann's application of N.J.S.A. § 2C:58-3(c) to Rachlin is categorically unconstitutional and must be enjoined as such. Indeed, "a law that burdens persons,

arms, or conduct protected by the Second Amendment and that does so with the effect that the core of the right is eviscerated is unconstitutional." *Binderup*, 836 F.3d at 364 (3d Cir. 2016) (Hardiman, J. concurring).  As Judge Hardiman further observed:

> We are not the first to recognize this categorical rule. As the Seventh Circuit has explained, '[b]oth *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home— are *categorically* unconstitutional.' *Id.* (quoting *Ezell*, 703 F.3d at 703).

Given that Baumann has completely barred Rachlin from acquiring, owning, or possessing firearms, *Heller* makes the next analytical steps clear. Because the Second Amendment "elevates" the core right to self-defense "above all other interests," infringements upon this "core protection" must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Id*. at 634–635. Baumann's wholesale prohibition on Rachlin's right to acquire *any* firearms is just such an infringement of core Second Amendment conduct. Accordingly, it is flatly unconstitutional.

*Heller* requires per se invalidation of bans that strike at the heart of the Second Amendment. In *Heller*, the Supreme Court declined the invitation to analyze the ban on the right to keep arms at issue there under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," *id*. at 689–90

(Breyer, J., dissenting), ruling instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id*. at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* had deliberately and "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion). This reasoning applies here, since complete barring Rachlin's right to keep and bear arms is an option that the Second Amendment takes "off the table." *Heller*, 554 U.S. at 636.

While the Third Circuit generally requires restrictions on Second Amendment rights to be scrutinized under "some form of means-end scrutiny," *Marzzarella*, 614 F.3d at 89, such scrutiny is not necessary or appropriate here, where the restriction in question is a flat, categorical ban on the acquisition of *any* firearms.  That is why other circuits that have adopted a tiers-of-scrutiny analysis as the default form of analysis for most Second Amendment challenges continue to apply *Heller's* categorical approach to " 'complete prohibition[s]' of Second Amendment rights." *Wrenn*, 864 F.3d at 665 (quoting *Heller*, 554 U.S. at 629); *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (striking down ban on carrying arms categorically despite circuit precedent applying levels-of-scrutiny analysis in other Second Amendment cases). Baumann's application of N.J.S.A. § 2C:58-3(c) to

Rachlin operates as just such a "complete prohibition," and it thus must be treated as categorically unconstitutional.

Furthermore, a recent decision from the Northern District of California regarding firearms and mental health is relevant to the subject of complete prohibition on firearms ownership and serves as an illustrative contrast to Rachlin's circumstances. *See Stokes v. United States DOJ*, 2021 U.S. Dist. LEXIS 142785* (N.D. Cal. July 30, 2021). When plaintiff Stokes was 18 years of age and a high-school senior in 2002, he was taken to a hospital by friends and family after ingesting various alcohol and drugs, including "psilocybin mushrooms", over a period of several days. *Id*. at *2-3. Following this "hallucinogenic drug binge", plaintiff indicated to an evaluating doctor that he would cease drug and alcohol use. *Id*. at 3. However, the next day, hospital personnel transferred the plaintiff to a psychiatric hospital. *Id*. Although plaintiff went voluntarily, he learned on the way to the psychiatric hospital that he was in fact being held involuntarily, or "certified", for 14 days pursuant to the California Welfare and Institutions Code. *Id*. at 3-4. However, no judge ever reviewed his case or committed the plaintiff. *Id*. at 4.

Thereafter, plaintiff graduated high school and college, and lived a law-abiding life, other than a misdemeanor conviction for carrying a concealed, unloaded pistol in 2006. *Id*. at 4-5. In 2016, plaintiff desired to inherit a pistol and hunting rifle from his grandfather. *Id*. at 5-6. But the California Department of Justice, having

conducted an eligibility check of the plaintiff, indicated that he was ineligible to receive a permit to possess the firearms based on his purported involuntary commitment for being a "danger to self or others or gravely disabled" in 2002. *Id*. at 6. However, the Court found that "it is undisputed that no judge ever became involved in our plaintiff's case, and he was never specifically found to be mentally ill and dangerous . . . ." *Id*. at 14. Although no records of the plaintiff's 14-day treatment at the psychiatric hospital survived due to the hospital's closure, the Court found that there were three key facts: (1) There was no judicial involvement in the purported commitment, (2) The plaintiff was not found to be both mentally ill and dangerous, and (3) The commitment could have been based on the plaintiff being *unable* to accept treatment voluntarily rather than being *unwilling* to accept treatment voluntarily. *Id*. at 27-28 (citing *Mai v. United States*, 952 F.3d 1106 (9th Cir. 2020). Moreover, the plaintiff testified that he voluntarily accepted treatment at both hospitals in question. *Id*. at 37-38. Therefore, the plaintiff was not disqualified under federal or state law from possessing firearms, and "defendants were wrong to deny Stokes a firearm permit on account of the . . . certification." *Id*. at 29; *see also Rhein v. Pryor*, 2014 U.S. Dist. LEXIS 36305* at 17-18 (N.D. Ill. Mar. 20, 2014) (where the Illinois State Police revoked plaintiff David Rhein's Firearms Owners Identification Card on the basis of an alleged mental condition, but he alleged that "[t]here [was] no reasonable basis to conclude [he] had a mental condition that

presented a clear and present danger to himself or anyone else", his allegations relating to his as-applied Second Amendment claim were deemed to be true at the pleading stage and survived dismissal.).

The contrasts between Stokes and Rachlin could not be clearer. Rachlin, unlike Stokes, does not use illegal drugs or abuse alcohol, has never been convicted of a crime, let alone a crime involving a firearm as Stokes was, and has not spent so much as a single minute in a psychiatric hospital. Moreover, when Rachlin voluntarily agreed to be evaluated at CentraState, he was a minor, whereas Stokes was an adult, albeit a high-school senior. Yet, even Stokes, who used multiple illegal drugs and was then transported to a psychiatric hospital, was not denied his right to acquire, own, and possess firearms. The similarities between Stokes and Rachlin are also important to note—neither has ever been adjudicated by a court or any other tribunal as a mental defective or as a danger to himself or others, and, notwithstanding Stokes's "certification", neither has ever been involuntarily committed or confined within the meaning of any law.

Ultimately, Rachlin, who, unlike Stokes, has no issues in his background that even remotely implicate dangerousness or any other potential disqualifying characteristic, is entitled to exercise his Second Amendment right to keep and bear arms, free from Baumann's categorical deprivation of same.

## VII.   Plaintiff Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction

The conclusion that Plaintiff has a reasonable probability of success on his Second Amendment claim compels the conclusion that he faces irreparable injury in the absence of injunctive relief. It is well-accepted that the deprivation of a constitutional right constitutes irreparable harm. *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013). The Third Circuit has recognized this rule in the context of a variety of constitutional rights. *See, e.g., id.* (First Amendment); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971) (Fourth Amendment). Rights under the Second Amendment should be treated no differently. *McDonald,* 561 U.S. at 780.

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights. . . . The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. Infringements of this right cannot be compensated by damages. *Ezell*, 651 F.3d at 699 quotation marks and citation omitted).

Each day Baumann's unconstitutional ban on Rachlin's acquisition of *any* firearms continues in force, Rachlin faces an ongoing and permanent loss of his Second Amendment rights.  This injury cannot be compensated through monetary damages alone and cannot be compensated without injunctive relief.  *See Id*.

## VIII.  The Balance of the Equities Favors the Grant of Preliminary Injunctive Relief

The public interest and balance of equities likewise favor Rachlin given that he is likely to succeed on the merits of his Second Amendment claim. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), for "the enforcement of an unconstitutional law vindicates no public interest," *K.A. ex rel. Ayers*, 710 F.3d at 114; *see also Wrenn*, 864 F.3d at 667. On the other side of the scale, Defendants will suffer no harm, as have no valid interest in enforcing a demand for clinical psychological screening that has no basis under New Jersey law or the U.S. Constitution.

Moreover, as discussed in Section I.A, *supra*, this case presents significant public interest considerations beyond the actual dispute between the parties.  If Baumann's unconstitutional conduct is not enjoined, local law enforcement officials will be emboldened to improperly act as *de facto* mental health professionals, with the result being the creation of an entirely new class of individuals disqualified from firearms possession, contrary to the laws of New Jersey, federal law, and the U.S. Constitution. Given that millions of Americans seek mental health counseling regularly to address a wide variety of issues that have nothing to do with firearms safety, they should not be punished and stigmatized through deprivation of

constitutional rights by misguided governmental actors who erroneously conflate mental health counseling with dangerousness.

### IX. The Court Should Waive the Bond Requirement or Set Bond at a Nominal Amount

While FED. R. CIV. P. 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," the Third Circuit has recognized that the district court may sometimes dispense with that requirement. *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991). In "noncommercial cases" such as this one the Court should "balance [ ] the equities of the potential hardships that each party would suffer as a result of a preliminary injunction" and may excuse the bond on that basis. *Elliott v. Kiesewetter*, 98 F.3d 47, 59–60 (3d Cir. 1996). "The court should also consider whether the applicant seeks to enforce a federal right and, if so, whether imposing the bond requirement would unduly interfere with that right." *Board of Educ. v. F.C. ex rel. R.C.*, 2 F. Supp. 2d 637, 646 (D.N.J. Apr. 22, 1998).  Here, Defendants will not suffer costs and damages from the proposed preliminary injunction, while imposing a more than *de minimis* bond would unduly interfere with Rachlin's Second Amendment rights. Plaintiff should therefore not be required to post security or should be required to post only a nominal amount.

## X.     The Court Should Enter Final Judgment Awarding a Permanent Injunction

FED. R. CIV. P. 65(a)(2) authorizes a court considering a motion for preliminary injunctive relief to "advance the trial on the merits and consolidate it with the hearing" on the motion for preliminary relief in appropriate cases. *See also DeLeon v. Susquehanna Cnty. Sch. Dist.*, 747 F.2d 149, 152 n.6 (3d Cir. 1984) ("[A] preliminary injunction hearing may be combined with a hearing on the merits, pursuant to FED. R. CIV. P. 65(a)(2), if it is accompanied by notice to the parties sufficient to enable them to present all of their evidence."); *Getzes v. Mackereth*, 2013 WL 5882040, at *2 (M.D. Pa. Oct. 30, 2013) (consolidating the merits with the preliminary injunction proceeding where the preliminary relief sought by the plaintiff "is the same which he hopes to ultimately obtain following a trial on the merits"). Courts have repeatedly held that such consolidation is appropriate where "no factual or legal disputes will remain once the Court resolves the preliminary injunction motion," *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62 n.1 (D.D.C. 2014), such that "the eventual outcome on the merits is plain at the preliminary injunction stage," *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994); *accord Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1102 (9th Cir. 1998), *abrogated on other grounds; Dream Palace v. County of Maricopa*, 384 F.3d 990, 1002 (9th Cir. 2004); *Kickapoo Traditional Tribe of Texas v. Chacon*, 46 F. Supp. 2d 644, 648–49 (W.D. Tex. 1999).

That is the case here. The key fact relevant to Rachlin's challenge—that Baumann is flatly and categorically preventing Rachlin from exercising *any* Second Amendment rights—is not plausibly in dispute. Rather, whether Rachlin's challenge will prevail turns entirely on this Court's resolution of the questions of law presented above—questions that the Court should resolve in Rachlin's favor as a matter of law. Accordingly, "the merits of the plaintiff's challenge are certain and don't turn on disputed facts," and the Court should enter final judgment and permanent, not merely preliminary, injunctive relief. *Wrenn*, 864 F.3d at 667; *see also Moore*, 702 F.3d at 942.

Therefore, the Court should issue a *permanent* injunction (1) enjoining and restraining Defendants from denying and continuing to deny Plaintiff's FID card application, (2) enjoining and restraining Defendants from engaging in acts and enforcing their policies, demands, practices, and customs that individually and collectively result in the denial of Plaintiff's FID card and violation of Plaintiff's right to keep and bear arms, including but not limited to Defendants' policy and demand that Rachlin submit to screening by a clinical psychologist in order to obtain an FID card, (3) requiring that Defendants issue Plaintiff an FID card and allow Plaintiff to acquire and possess firearms in accordance with New Jersey law, and (4) to the extent State law formed the basis of Defendants' past and continuing denial

of Plaintiff's FID card and right to keep and bear arms, enjoining and restraining Defendants from continuing to enforce such provisions against Plaintiff.

## CONCLUSION

For the foregoing reasons, the Court should restrain and enjoin Defendants as set forth herein.


Dated:   September 21, 2021                                    Respectfully submitted,

                                                        By: s/ Edward A. Paltzik
                                                            Edward A. Paltzik
                                                    JOSHPE MOONEY PALTZIK LLP
                                                        1407 Broadway, Suite 4002
                                                          New York, NY 10018
                                                          Tel: (212) 344-8211
                                                          Fax: (212) 313-9478
                                                          epaltzik@jmpllp.com

                                                        *Attorneys for Plaintiff*