**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AVI ALEXANDER RACHLIN, <br><br> Plaintiff, <br><br> v. <br><br> GEORGE K. BAUMANN, Individually and as Chief of Police of the FREEHOLD TOWNSHIP POLICE DEPARTMENT and FREEHOLD TOWNSHIP, <br><br> Defendants. | Civ. Action No. 21-15343 (FLW) <br><br> **OPINION** |

**WOLFSON, Chief Judge**:

Before the Court is a motion to dismiss filed by defendants George K. Baumann and Freehold Township (the "Township") (collectively, "Defendants") and a motion for a preliminary injunction filed by plaintiff Avi Alexander Rachlin ("Plaintiff"). Plaintiff alleges that Defendants violated his rights under the Second Amendment of the U.S. Constitution by denying him a permit to purchase a firearm absent certification from a licensed clinical psychologist that his possession of a firearm would not endanger himself or others. Plaintiff also alleges that Defendants violated his right to free speech under the First Amendment by denying his application in retaliation against public criticism Plaintiff voiced in connection with Defendants' review of his application. Defendants move to dismiss both claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff opposes the Motion to Dismiss, and Defendants oppose the Motion for a Preliminary Injunction. "In the interest of expediency, the Court has elected to consider and rule on both [the Motion to Dismiss and the

Motion for a Preliminary Injunction] simultaneously." *Sable v. Velez*, Civ. No. 09-2813, 2009 WL 3379939, at *1 (D.N.J. Oct. 16, 2009), *vacated on other grounds*, 388 F. App'x 235 (3d Cir. 2010). For the reasons set forth herein, Defendants' Motion to Dismiss is **GRANTED**, and Plaintiff's Motion for a Preliminary Injunction is **DENIED** as moot.[1]

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Legislative and Regulatory Background

In New Jersey, with certain limited exceptions that are not applicable here, "[n]o person shall . . . purchase or otherwise acquire . . . a rifle or shotgun . . . unless the purchaser possesses a valid firearms purchaser identification card [("FPIC")]." N.J.S.A. 2C:58-3(b)(1).[2] "No person of good character and good repute in the community in which he lives," and who is not subject to any of the ten "disabilities" set forth by statute, "shall be denied a[n] . . . [FPIC]." N.J.S.A. 2C:58-3(c). Among the ten enumerated "disabilities," as relevant here, "[n]o . . . [FPIC] shall be issued:"

. . .

(2) . . . to any person who is confined for a mental disorder to a hospital, mental institution or

---

[1] In their Motion to Dismiss, Defendants attached certain medical records pertaining to Plaintiff, which Defendants obtained with Plaintiff's consent as part of the investigation underlying Plaintiff's firearm permit application. Motion to Dismiss ("MTD") Ex. D, ECF No. 19-6. Plaintiff attached the same records to his Opposition to the Motion to Dismiss. Declaration of Edward A. Paltzik ("Paltzik Decl.") Ex. 1, ECF No. 27-3. The records attached to both the Motion to Dismiss and Plaintiff's Opposition contain some redactions, but both versions include sensitive medical information about Plaintiff that is unredacted. Plaintiff has not requested that the Court seal or redact any particular information. However, to prevent the disclosure of sensitive information, the Court has placed under seal all documents filed in this case that contain Plaintiff's medical records or refer to sensitive information included in those records, including this Opinion. *See* L. Civ. R. 5.3(c)(9). As directed in the Order accompanying this Opinion, the parties must confer and present the Court with a proposal as to any appropriate redactions or any documents containing sensitive information that ought to remain under seal.

[2] Similarly, "[n]o person shall . . . purchase, or otherwise acquire a handgun unless the purchaser . . . has first secured a permit to purchase a handgun as provided by [the section in which this requirement appears]." N.J.S.A. 2C:58-3(a)(1). Plaintiff has not alleged that he applied for a handgun permit or that this requirement is otherwise at issue.

sanitarium . . .;

(3) To any person who suffers from a physical defect or disease which would make it unsafe for him to handle firearms, to any person who has ever been confined for a mental disorder, or to any alcoholic unless any of the foregoing persons produces a certificate of a medical doctor or psychiatrist licensed in New Jersey, or other satisfactory proof, that he is no longer suffering from that particular disability in a manner that would interfere with or handicap him in the handling of firearms; to any person who knowingly falsifies any information on the application form for a . . . [FPIC];

. . .

(5) To any person where the issuance would not be in the interest of the public health, safety or welfare;

. . .

N.J.S.A. 2C:58-3(c). With respect to the disability identified in N.J.S.A. 2C:58-3(c)(5), the legislature's intent was to "delegate[] authority to appropriately designated officials to disqualify any unfit individuals who, though not strictly within the enumerated classes, should not in the public interest be entrusted with firearms." *Burton v. Sills*, 53 N.J. 86, 91 (1968); *In re Forfeiture of Pers. Weapons & Firearms Identification Card belonging to F.M.*, 225 N.J. 487, 507–08 (2016).

To obtain an FPIC, an individual must submit an application containing certain information required by statute. *See* N.J.S.A. 2C:58-3(d)–(e). Consistent with statutory requirements, *see* N.J.S.A. 2C:58-3(e), applicants must complete S.T.S. 033 ("Form 033"), N.J.A.C. 13:54-1.4(a), Item 24 of which requires applicants to answer: "Have you ever been confined or committed to a mental institution or hospital for treatment or observation of a mental or psychiatric condition on a temporary, interim, or permanent basis? If yes, give the name and location of the institution or hospital and the date(s) of such confinement or commitment." Compl. ¶ 34. In addition, Item 26 requires applicants to answer the following question: "Have you ever been attended, treated or observed by any doctor or psychiatrist or at any hospital or mental institution on an inpatient or outpatient basis for any mental or psychiatric condition? If yes, give the name and location of the

doctor, psychiatrist, hospital or institution and the date(s) of such occurrence." *Id.* Applicants must check either a "Yes" or "No" box in response to Items 24 and 26. *Id.* Applicants must also submit "a consent for mental health records search form designated S.P. 66" ("Form 66"). N.J.A.C. 13:54-1.4(d).

The chief of police in the municipality where the applicant resides must "investigate the application to determine whether or not the applicant has become subject to any of the disabilities" enumerated *supra*. N.J.S.A. 2C:58-3(e). The chief of police "shall[,] upon application, issue" an FPIC "to any person qualified under the provisions of subsection c." N.J.S.A. 2C:58-3(d). If an application is denied, the applicant "may request a hearing in the Superior Court of the county in which he resides . . . within 30 days of the denial." *Id.* The Superior Court must hold a hearing within 30 days of the applicant's request. *Id.*

### B.    Factual Background

On October 24, 2020, Plaintiff submitted an application for an FPIC to Baumann, the Chief of Police of the Freehold Township Police Department ("FTPD" or the "Department") and the issuing authority for FPICs in the Township. Compl. ¶ 4. Plaintiff alleges that he has never been "confined or committed to a mental institution or hospital for treatment or observation of a mental or psychiatric condition." *Id.* ¶ 40. However, in responding to Item 24 of Form 033, Plaintiff checked the "Yes" box and provided the following supplemental response:

> To the best of my memory, it was 1 time, 4 years ago for a period that lasted 3 hours. This was at the request of my parents. I was evaluated ████████ [sic] where a medical professional cleared me and I was discharged. The FTPD transported me in the back of the cruiser. I was not handcuffed or restrained. I do not remember the exact date this occurred.

*Id.* Plaintiff alleges that he was "voluntarily evaluated" at the ███████████████████ ████████████████ at the request of his parents. *Id.* ¶ 41. In responding to Item

26, which pertains to past psychiatric treatment, Plaintiff also checked the "Yes" box and added the following supplemental response:

> To the best of my memory, it was 1 time, 4 years ago, where I went to a psychiatrist for ███████████████████████████████████████████████████████████. I have not dealt with any medical professional related to my mental health in over 4 years. I do not remember the exact date this occurred or who the Dr was.

*Id.* Plaintiff also submitted Form 66, consenting to the release of his mental health records. *Id.* ¶ 39.

Plaintiff's medical records shed additional light on his admission to ███████te, as discussed in the portion of his FPIC application quoted in his Complaint. The records reveal that on May 20, 2017, Plaintiff's parents arranged for his admission to ███████, ███████████████ ███████████████████████████████████████ MTD Ex. D, ECF No. 19-6 at 60, 62. ███████████████████████████████ *Id.* at 62. According to the records, Plaintiff had recently posted "racially biased videos on YouTube," leading to his suspension from school. *Id.* at 60. In response, Plaintiff's father had turned off the electricity in Plaintiff's room to prevent him from using his computer. *Id.* On the evening of May 20, Plaintiff's father discovered Plaintiff attempting to turn the electricity back on, leading Plaintiff's parents to call the police and arrange for his admission to ███████████ *Id.*



*Id.*[3]

---

[3] Although "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings[,] . . . a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). Plaintiff's claims are not "based on" ▮▮▮▮▮▮ records in the same way that a plaintiff's breach-of-contract claim is "based on" the underlying contract, *cf. Pension Benefit Guar. Corp.*, 998 F.2d at 1196, and Plaintiff allegedly did not have possession of these records when he filed his Complaint. *See* ECF No. 27 at 24–25. Nevertheless, the records are a central component of the investigation underlying Defendants' FPIC application. Moreover, as will become evident *infra*, Plaintiff's Complaint is premised on his assertion that nothing in his medical history justified Defendants' policy resulting in the denial of his FPIC application. His records from ▮▮▮▮▮ therefore bear directly on the plausibility of his claims. The Complaint also refers to the incident underlying the ▮▮▮▮▮ records, and Plaintiff was undoubtedly aware of the information contained therein, the accuracy of which he does not contest. Accordingly, the records are "integral" to Plaintiff's Complaint, *Burlington Coat Factory*, 114 F.3d at 1426, and the Court will consider them on this Motion to Dismiss. In any event, nothing would prevent the Court from considering these records, which are also attached to Defendants' Opposition to the PI Motion, in deciding whether to grant a preliminary injunction under a likelihood of success standard. *See* Certification of Timothy C. Moriarty Ex. A, ECF No. 21-2 at 23–40. If the Court were to do so, it would yield the

On November 7, 2020, Plaintiff submitted his fingerprints as part of his FPIC application, and the New Jersey State Police completed its required background check on November 11. Compl. ¶¶ 42–43. Throughout November and December 2020, Plaintiff alleges that "Baumann took no action with respect to [Plaintiff's] application," and that in January 2021, Plaintiff began responding to the delays. *Id.* ¶¶ 44–45. On January 4, 2021, Plaintiff submitted a New Jersey Open Public Records (OPRA) request to the FTPD seeking information pertaining to processing FPIC applications, which the FTPD denied. *Id.* ¶ 46. Likewise, on January 15, 2021, Plaintiff sent an email to Freehold Township Mayor Thomas Cook, expressing his frustration with the delays in processing his application. *Id.* ¶ 47. At Cook's request, Township Administrator Peter Valesi responded on January 19, 2021, blaming the delay on an "unprecedented" volume of applications. *Id.* ¶ 48. Plaintiff requested that Valesi provide an "average timeframe" for processing FPIC applications during the pandemic, to which Valesi responded that the Township was processing applications submitted in November 2020 and that Plaintiff's application was "being 'worked on.'" *Id.* ¶ 49. Following his correspondence with Valesi, on February 8, 2021, Plaintiff visited the FTPD headquarters to request an update on his application. *Id.* Plaintiff alleges that FTPD Officer Sean Foley did not provide an update and instead requested that Plaintiff complete Form 66 again, notwithstanding Plaintiff's explanation that he had already submitted Form 66 with his application. *Id.* Nevertheless, Plaintiff complied with the request, and he alleges that Officer Foley assured him that his application would be processed within two weeks. *Id.*

Following his interaction with Officer Foley, Plaintiff made a series of public statements in February 2021, expressing his continued frustration regarding the delays in processing his FPIC application. On February 9, 2021, Plaintiff posted an explanation of his circumstances on *Reddit*,

---

same result.

noting Officer Foley's request that he complete Form 66 a second time. *See id.* ¶ 50. Likewise, on February 22, 2021, Plaintiff added another series of *Reddit* posts, which were entitled "Join me 2/23 @ 8 PM Est at Freehold's City Council Meeting where I will address the town's total mismanagement of FID Cards." *Id.* ¶ 51. On the evening of February 23, 2021, Plaintiff spoke at the Freehold Town Council ("FTC") meeting, recounting the FTPD's delays in processing his application and criticizing the Department. *See id.* ¶¶ 52–53. Plaintiff alleged that the FTPD had "violated two state laws" by "taking longer than 30 days to rule on an application" and "having [Plaintiff] fill out an S.P. 66 when [his] situation didn't warrant it." *Id.* ¶ 53. After his speech, two FTC committee members told Plaintiff they would discuss his application with Baumann, and Plaintiff posted a video of his speech that evening. *Id.* ¶ 54. On February 26, 2021, Baumann called Plaintiff and explained that Plaintiff's "[FPIC] application was 'approved' and 'good to go.'" *Id.* ¶ 55. Baumann allegedly told Plaintiff to wait several days for the FTPD to complete the paperwork and that Plaintiff could then pick up his FPIC. *Id.* Baumann also allegedly notified Plaintiff "that, in sum and substance, '[the FTPD was] thinking about requesting that [Plaintiff] be screened but ultimately determined [his] issues were very minor and so long ago.'" *Id.*

On March 2, 2021, the officer assigned to investigate Plaintiff's FPIC application—Officer Joe Winowski—provided a report to Baumann in which he highlighted Plaintiff's history of depression and self-harm, as well his admission to ▮▮▮▮▮▮ but he nevertheless recommended approving Plaintiff's application. *See* ECF No. 27 at 19; Paltzik Decl. Ex. 1, ECF No. 27-3 at 10–12.[4] However, the next day, Baumann allegedly notified Plaintiff that "he was now concerned that

---

[4] Officer Winowski's report was not attached to the Complaint and was originally attached to Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction. *See* Paltzik Decl., ECF No. 27-2 ¶¶ 3, 5. Plaintiff's Opposition to the Motion to Dismiss quotes from portions of the report and attaches the full report as an exhibit. *See* ECF No. 27 at 19; Paltzik Decl. Ex. 1, ECF No. 27-3 at 10–12. As with Plaintiff's ▮▮▮▮▮▮ records, I will consider Winowski's report on this Motion as a document that is "integral" to Plaintiff's Complaint, *Burlington Coat Factory*, 114 F.3d at 1426, as

[Plaintiff] was a danger to himself" and that Plaintiff would need to "obtain 'clearance' from a 'mental health professional,'" certifying that Plaintiff was "not a danger to himself or others." Compl. ¶ 56. Baumann also delivered a letter to Plaintiff on March 4, 2021, stating:

> As per our conversation on March 3, 2021, in order for me to approve you obtaining a NJ Firearms ID card, I am requesting that you get evaluated and screened by a clinical psychologist. I am requiring that you get clearance from that doctor stating that you owning or possessing a firearm will not cause any safety issues to yourself or the general public. As soon as I receive these assurances, I will be able to approve your application for a NJ Firearms ID Card.

*Id.* ¶ 57. Plaintiff alleges that on March 3, he obtained a quote for screening services from a clinical psychologist, which would cost $2,500. *Id.* ¶ 60. Plaintiff alleges that he could not afford to spend that amount "without imposing burdens in other areas of financial need or financial planning." *Id.*

Nevertheless, Plaintiff alleges that he "made a good faith effort to comply and provide Baumann with further evidence that he was not a danger to himself or others." *Id.* ¶ 61. On March 12, 2021, Plaintiff met with Jordan Faiman, a licensed professional counselor (LPC) who had counseled Plaintiff from 2013 to July 2017. *Id.* ¶¶ 18, 61–62. Plaintiff's insurance covered the meeting, which took place via video conference. *Id.* ¶¶ 61–62. Faiman drafted a letter dated March 19, 2021, summarizing his findings. *Id.* ¶ 63. He recalled that "safety concerns weren't indicated in the original referral" from 2013. *Id.* Regarding the March 12 evaluation, he wrote:

> . . . I was contacted again by Mr. Rachlin himself, in early March 2021 to discuss and process the matter at hand, including an exploration of the past 4 years since his final therapy session. I am unable to comment on safety concerns over the course of 4 years since this last session, however, based on Mr. Rachlin's description of his success in the later years of high school and ultimate acceptance into secondary schooling, I am able to surmise he has left any prior mental health and/or safety issues in his adolescent/early teenage years. Further, during the 03/12/2021 tele-counseling session, I was able to conduct a formal safety assessment with Mr. Rachlin, to which I was able to determine he is not currently a danger to himself and/or others. In fact, given his current achievements at his secondary school, it seems likely his future is bright.

---

the report is part of the FTPD's investigative record underlying Plaintiff's FPIC application, which is central to Plaintiff's claims.

*Id.* Plaintiff submitted Faiman's letter to Baumann on March 19, 2021. *Id.* ¶ 67. Plaintiff also

obtained a letter from a Monmouth County Adjuster confirming that there are no records of Plaintiff

having been confined or committed. *Id.* ¶ 64.

On March 19, 2021, Baumann delivered a letter to Plaintiff rejecting Faiman's letter and

reiterating his request that Plaintiff provide a letter from a clinical psychologist. *Id.* ¶ 68. Baumann's

letter stated:

> On March 4, 2021, I had sent you a letter requesting that you get evaluated and screened by
> a clinical psychologist in order for me to approve your firearms application. Today, March
> 19, 2021, I received a letter from Jordan Faiman Licensed Professional Counselor and
> Approved Clinical Supervisor. Unfortunately, this did not fulfil [sic] my request of being
> evaluated and screened by a clinical psychologist. In addition to getting evaluated and
> screened, I requested a letter from the clinical psychologist to clearly indicate that you
> owning or possessing a firearms [sic] will not cause any harm to yourself or the general
> public. Until I receive these assurances, I will be unable to approve your application for a
> NJ Firearms ID card.

*Id.* Baumann also left Plaintiff a voicemail reiterating the points in his letter, noting that Plaintiff

had to be "evaluated and screened by a clinical psychologist" who could attest that Plaintiff's

ownership of a firearm would "not cause any safety issues to [Plaintiff] or the general public." *Id.* ¶

69. Baumann noted that he did not "want to just deny [Plaintiff's] application" and that he "want[ed]

to be fair" by "giv[ing] [Plaintiff] an opportunity." *Id.*

After receiving Baumann's letter, Plaintiff allegedly made additional efforts to obtain a

dangerousness determination from a clinical psychologist. *Id.* ¶ 70. On March 19, 2021, Plaintiff

allegedly called seven in-network clinical psychologists within 15 miles of his home to inquire about

a screening. *Id.* Some failed to return his call, and others allegedly were unable to "schedule a timely

appointment for [Plaintiff] in the midst of the COVID-19 pandemic." *Id.*

Several days later, Plaintiff made additional public statements expressing his frustration with

the FPIC application process. Plaintiff made three posts on *Reddit* advertising his forthcoming

speech at an upcoming FTC meeting, and a fourth post stated, *inter alia*: "I really believe my only avenue at this point is to sue. Clearly, nothing will satisfy him (Police Chief)." *Id.* ¶ 71. On March 23, 2021, a publication called the Blue Star Union interviewed Plaintiff on its *YouTube* channel, during which Plaintiff expressed his belief that "the police chief is abusing his discretionary authority." *Id.* ¶ 72. During the FTC meeting later that evening, Plaintiff further criticized Baumann, claiming that "rather than taking accountability for the obvious failures of internal management, Chief Baumann instead decides to deflect blame and not take responsibility." *Id.* Plaintiff alleges that Baumann learned of Plaintiff's speech, which was also posted on *YouTube*, from several FTC members. *Id.* ¶ 73.

On March 26, 2021, Plaintiff received an automated notification that his FPIC application had been denied. *Id.* ¶ 74. The same day, Baumann delivered a letter to Plaintiff stating: "Your Firearms application background investigation has revealed potential grounds to deny your application on the basis of Public Health Safety and Welfare." *Id.* ¶ 75. The letter further explained that "[i]n accordance with NJSA 2C:58-3C, you have the option of requesting a Pre-Decision Conference with the Chief of Police, prior to a final denial of your application," in order to "allow you the opportunity to bring forth any additional information that may change the status of your application from potentially being denied." *Id.* The letter further clarified that Plaintiff was not obligated to participate in a "Pre-Decision Conference" but that, if he chose not to do so, his "application denial [would] be finalized." *Id.* Plaintiff apparently did not request a "Pre-Decision Conference," but on March 29, 2021, Plaintiff allegedly requested a hearing before the Monmouth County Superior Court pursuant to N.J.S.A. 2C:58-3(d). *See id.* ¶¶ 80–81. As of June 2, 2021, which was after the 30-day statutory deadline, the Superior Court had not yet held a hearing on Plaintiff's request, and on the same day, Plaintiff withdrew his request for a hearing. *Id.* ¶ 82.

### C.     Procedural History

Plaintiff filed his Complaint in this Court on August 16, 2021, asserting two counts against all defendants pursuant to 42 U.S.C. § 1983. Count One asserts that Defendants violated the Second and Fourteenth Amendments of the U.S. Constitution by (a) denying Plaintiff's FPIC application despite the fact that he is allegedly not disqualified from possessing a firearm under New Jersey or federal law, (b) requiring Plaintiff to undergo screening by a clinical psychologist in order to obtain an FPIC, and (c) subjecting Plaintiff to an "unconstitutional delay" in processing his application. Count Two asserts that Defendants violated the First and Fourteenth Amendments by taking the aforementioned actions in retaliation against Plaintiff's public statements criticizing Defendants, which are constitutionally protected speech. Plaintiff brings these claims against Baumann, in his individual and official capacity, and the Township as a municipality liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Plaintiff seeks a declaration that Defendants' actions are unconstitutional, as well as a preliminary and permanent injunction enjoining the denial of his FPIC application. Plaintiff also seeks compensatory, punitive, and nominal damages.

On September 21, 2021, Plaintiff filed a Motion for a Preliminary and Permanent Injunction, contending that he is likely to succeed on the merits of his Second Amendment claim. *See* ECF No. 7-1, Motion for a Preliminary and Permanent Injunction ("PI Motion"). Plaintiff does not base his PI Motion on his First Amendment claim. The PI Motion requests that the Court enjoin Defendants from denying Plaintiff's FPIC application and from requiring Plaintiff to undergo screening by a clinical psychologist in order to obtain an FPIC. *Id.* at 13. Plaintiff also requests that the Court require Defendants to issue an FPIC to Plaintiff and, "to the extent State law formed the basis of Defendants' past and continuing denial of Plaintiff's [FPIC]," enjoin Defendants from continuing to enforce such provisions against Plaintiff. *Id.* at 13–14.

On October 12, 2021, Defendants filed their Motion to Dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Motion to Dismiss ("MTD"), ECF No. 19. Defendants filed their Response to the PI Motion on October 18, 2021, ECF No. 21, and Plaintiff filed his Reply on October 23, 2021. ECF No. 23. On November 18, 2021, Plaintiff filed his Opposition to the Motion to Dismiss, ECF No. 27, and Defendants filed their Reply on November 29, 2021. ECF No. 29. Because Plaintiff's claims are subject to dismissal, I need not also resolve Plaintiff's PI Motion.

## II.    LEGAL STANDARD

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quotations and citations omitted). While Federal Rule of Civil Procedure 8(a)6 does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Thus, to survive a Rule 12(b)(6) motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a plaintiff has met the facial plausibility standard under *Twombly* and *Iqbal*, courts within this Circuit apply a three-step test. *Santiago v. Warminster Twp.*, 629 F.3d 121,

130 (3d Cir. 2010). First, the court must "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id*. Finally, where "there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## III.    DISCUSSION

Defendants move to dismiss on the following grounds: (*i*) the Court must abstain from hearing Plaintiff's claims under *Younger v. Harris*, 401 U.S. 37 (1971), based on Plaintiff's purported failure to exhaust his administrative remedies; (*ii*) Plaintiff lacks standing; (*iii*) Plaintiff's claims are not ripe; (*iv*) Plaintiff fails to state a claim under the First and Second Amendments; (*v*) qualified immunity bars Plaintiff's claims against Baumann; (*vi*) Plaintiff fails to establish municipal liability against the Township; and (*vii*) Plaintiff allegedly falsified his FPIC application. MTD, ECF No. 19.[5] I disagree with Defendants regarding *Younger* abstention, standing, and ripeness. However, Plaintiff has failed to state a claim under the First or Second Amendments, and his claims against Baumann and the Township are dismissed on that basis. I therefore do not reach the issues of qualified immunity or Plaintiff's alleged falsification of his application.

### A.    Abstention and Exhaustion of Administrative Remedies

Defendants request that the Court abstain pursuant to *Younger* based on Plaintiff's purported failure to exhaust his administrative remedies.[6] For the following reasons, *Younger* does not counsel

---

[5] In their Opposition to the PI Motion, Defendants contend that Plaintiff "also fails to establish an underlying cause of action for a violation of procedural due process rights under the Due Process Clause of the Fourteenth Amendment." ECF No. 21 at 29. However, as Plaintiff clarifies, the Complaint "does not assert any such cause of action," ECF No. 23 at 21, and I do not address any due process claim, here.

[6] To the extent that Defendants contend the Court must dismiss Counts One and Two based on Plaintiff's purported failure to exhaust his administrative remedies, separate and distinct from the

abstention, here.

Under *Younger*, federal courts must "abstain from deciding cases that would interfere with certain ongoing state proceedings." *Malhan v. Sec'y United States Dep't of State*, 938 F.3d 453, 461 (3d Cir. 2019). "*Younger* [abstention] applies to only 'three exceptional categories' of proceedings: (1) 'ongoing state criminal prosecutions'; (2) 'certain 'civil enforcement proceedings''; and (3) 'pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Id.* at 462 (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78–79 (2013)). Civil proceedings include "state administrative proceedings." *O'Neill v. City of Philadelphia*, 32 F.3d 785, 789 (3d Cir. 1994) (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982)). If any such proceeding is at issue, three requirements must be satisfied before *Younger* abstention applies: "(1) there must be pending or ongoing state proceedings which are judicial in nature; (2) the state proceedings must implicate important state interests; and (3) the state proceedings must afford an adequate opportunity to raise any constitutional issues." *O'Neill*, 32 F.3d at 789 (citing *Middlesex*, 457 U.S. at 432).

*Younger* abstention applies to administrative proceedings "initiated by the state" that are "coercive," rather than "remedial," in nature.[7] *O'Neill*, 32 F.3d at 791 & n.13; *Wyatt v. Keating*, 130

---

applicability of *Younger* abstention, Defendants' position is without merit. The administrative exhaustion doctrine generally "provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *McKart v. United States*, 395 U.S. 185, 193 (1969) (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938)). However, the "exhaustion of state administrative remedies [is not] a prerequisite to bringing an action pursuant to [42 U.S.C.] § 1983." *Patsy v. Florida Board of Regents*, 457 U.S. 496, 516 (1982); *LaPosta v. Borough of Roseland*, 309 Fed. App'x 598, 600 n.1 (3d Cir. 2009) ("Exhaustion is not a prerequisite to the assertion of a § 1983 . . . claim.") (citing *Patsy*, 457 U.S. at 516). Here, because Plaintiff brings Counts One and Two pursuant to section 1983, Compl. ¶¶ 94–95, 115–16, the administrative exhaustion requirement does not apply.

[7] Because I need not resolve the issue here, I "will assume without deciding . . . that an administrative adjudication," such as Baumann's initial FPIC determination, "and the subsequent state court's

F. App'x 511, 514–15 (3d Cir. 2005) (concluding under *O'Neill* that *Younger* abstention did not apply because the proceeding at issue was "remedial" given that "it was initiated by [the plaintiff] at his own option to remedy a perceived wrong by the state—the revocation of his license"); *Durga v. Bryan*, Civ. No. 10-1989, 2011 WL 4594281, at *6 (D.N.J. Sept. 30, 2011) (*Younger* abstention inapplicable where plaintiff did not exhaust option to appeal chief of police's denial of firearm license application to state court because the proceeding was "remedial" rather than "coercive"). In *O'Neill*, the Third Circuit concluded that the City of Philadelphia's enforcement of a traffic ticket was "coercive" such that *Younger* abstention applied. *Id. O'Neill* concluded that these proceedings were "coercive" rather than "remedial" by contrasting the proceedings at issue in two Supreme Court decisions: *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986), and *Patsy*. The proceedings in *Dayton Christian Schools* were "coercive" and qualified for *Younger* abstention because they "involved an administrative proceedings [*sic*] initiated by the [Ohio Civil Rights Commission], before a state forum, to enforce a violation of [a] state [anti-discrimination] law." *O'Neill*, 32 F.3d at 791 n.13. In contrast, the proceedings in *Patsy* were "remedial" because they involved an "action brought by the plaintiff to vindicate a wrong which had been inflicted by the State," *id.*, namely, gender and racial discrimination. *See* 457 U.S. at 498.

The proceedings at issue here are not the type to which *Younger* abstention applies because they are "remedial" rather than "coercive" in nature. Similar to *Wyatt* and *Durga*, the proceedings here, which consist of Plaintiff's right to appeal Defendants' denial of his FPIC application to the Superior Court, are "remedial" because they were "initiated by [Plaintiff] at his own option to remedy" Defendants' purportedly unlawful action. *See Wyatt*, 130 F. App'x at 514; *Durga*, 2011 WL 4594281, at *6 ("Plaintiff attempted to file a state court appeal and subsequently filed a complaint in

_____

review of it count as a 'unitary process' for *Younger* purposes." *Sprint*, 571 U.S. at 78.

federal court in an attempt to exercise his Second Amendment rights, which more closely resembles the sort of remedial actions that *O'Neill* explained did not require exhaustion."). And unlike *O'Neill*, the proceeding here was not "coercive" because it was not "initiated by the State, before a state forum, to enforce a violation of state law." 32 F.3d at 791 n.13; *Wyatt*, 130 F. App'x at 514–15 (proceeding "was not coercive because it was not instituted by the state to penalize an alleged violation of law by [the plaintiff]"). Accordingly, *Younger* abstention is not appropriate in these circumstances.

Defendants' reliance on *W.K. v. New Jersey Division of Developmental Disabilities*, 974 F. Supp. 791 (D.N.J. 1997), is unavailing. *W.K.* concluded that *Younger* abstention applied where the plaintiff had failed to exhaust his administrative remedies following the denial of state benefits. *See id.* at 794. However, "*W.K.* makes no mention of the . . . distinction" between coercive and remedial proceedings emphasized in *O'Neill* and *Wyatt*. *Sable*, 2009 WL 3379939, at *4 n.1. Like other courts in this district, I "decline to adopt [the] holding in [*W.K.*]," here. *Id.*

### B.    Article III Standing

In their Opposition to the PI Motion, Defendants maintain that Plaintiff failed to establish Article III standing[8] because he did not appeal the denial of his FPIC to the Superior Court. This argument is without merit.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). Defendants do not contest that Plaintiff suffered a cognizable injury stemming from the

---

[8] While Defendants do not raise this argument in their Motion to Dismiss, I will address it here nevertheless, as "courts must decide Article III standing issues, even when not raised by the parties, before turning to the merits." *Chong v. District Dir., I.N.S.*, 264 F.3d 378, 383 (3d Cir. 2001).

denial of his FPIC application, or that the relief Plaintiff requests would likely redress his injury. Rather, Defendants contend that they did not cause Plaintiff's injury because he failed to appeal the denial to the Superior Court, a purportedly self-inflicted injury that broke the causal chain. ECF No 21 at 23.

While the Third Circuit has not addressed self-inflicted injuries in the context of the standing doctrine, other courts have concluded that "'standing is not defeated merely because the plaintiff has in some sense contributed to his own injury.'" *St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000) (quoting 13 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3531.5, at 458 (2d ed.1984)). "An injury is 'self-inflicted' so as to defeat standing only if 'the injury is so completely due to the plaintiff's own fault as to break the causal chain.'" *Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344 (2d Cir. 2015) (quoting *St. Pierre*, 208 F.3d at 402). Further, the "[f]ailure to exhaust alternative means of redress need not break the causal chain." 13 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3531.5 (3d ed. 2021) (citing *Okla. Dept. of Envtl. Quality v. E.P.A.*, 740 F.3d 185, 189–90 (D.C. Cir. 2014) ("*ODEQ*") (holding that the state of Oklahoma suffered an injury traceable to an Environmental Protection Agency (EPA) rule divesting Oklahoma of certain regulatory authority over particular territory, notwithstanding the fact that the state could likely regain such authority by seeking relief from the EPA under a separate statute, because it was possible the EPA would attach conditions to Oklahoma's authority even if it secured the proposed statutory relief)).

Here, Plaintiff did not break the causal chain by failing to appeal the denial of his FPIC application to the Superior Court. Although *ODEQ* arose in a different context, its underlying principles offer guidance in this case. The state's injury in *ODEQ* was not "self-inflicted" because it was possible that the state would fail to secure the complete relief it sought through the proposed statutory remedy. *See id.* ("The possibility of an alternative remedy, of uncertain availability and

effect, does not render [the state's] injury self-inflicted."). As such, the injury was not "'so completely due to the complainant's own fault as to break the causal chain.'" *See id.* at 190 (quoting *Petro–Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989)). Similarly, here, Plaintiff's failure to appeal the denial of his FPIC application is not self-inflicted because there was no guarantee— indeed, according to Defendants, it was unlikely—that the Superior Court would reverse Baumann's denial. Accordingly, Plaintiff's injury is not "so completely due to [his] own fault as to break the causal chain.'" *Shah*, 788 F.3d at 344 (quotations and citations omitted).

*Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512 (7th Cir. 2012), on which Defendants rely, is not to the contrary. There, a zoning commission had denied the plaintiff's license application, which a district court affirmed. *Id.* at 516. The plaintiff, thereafter, voluntarily dismissed certain constitutional claims he had asserted against the city in connection with the denial of his application, and he then reasserted similar claims in a subsequent lawsuit. *Id.* The district court hearing the plaintiff's subsequent lawsuit concluded that the order affirming the denial of the plaintiff's application constituted an injury-in-fact based on its potential preclusive effect in the subsequent lawsuit. *Id.* at 517. But the Seventh Circuit reversed, holding that the injury was not traceable to the defendant because it was based solely on the plaintiff's litigation conduct in electing to dismiss the previous claims. *Id.* at 517–18. In contrast, here, the injury Plaintiff asserts is not the potentially preclusive effect of Defendants' denial, but rather the denial itself, which is traceable only to Defendants. Accordingly, *Parvati* is not applicable in this case.

### C.    Ripeness

For largely the same reasons that they contest standing, Defendants maintain in their PI Motion that Plaintiff's claims are not ripe. Again, Defendants' position is unavailing.

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative

policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dept. of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149 (1967)). The doctrine derives "'both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Id.* (quoting Reno v. Catholic Social Services, Inc., 509 U.S. 43, 57, n.18 (1993)). In determining whether the plaintiff's claims are "ripe as a matter of prudence," which is the basis of Defendants' ripeness challenge, ECF No. 21 at 19, the Court must examine 1) "'the fitness of the issues for judicial decision'" and 2) "'the hardship to the parties of withholding court consideration.'" *N.Y. Shipping Ass'n, Inc. v. Waterfront Comm'n of N.Y. Harbor*, 460 F. App'x 187, 189 (3d Cir. 2012) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 730, 733 (1998)). According to Defendants, the issues before the Court are not yet fit for judicial review.

In determining "[w]hether a question is fit for judicial review," the Court must assess "'factors such as [(1)] whether the agency action is final[,] [(2)] whether the issue presented for decision is one of law which requires no additional factual development[,] and [(3)] whether further administrative action is needed to clarify the agency's position.'" *Nextel Commc'ns of Mid-Atl., Inc. v. City of Margate*, 305 F.3d 188, 193 (3d Cir. 2002) (quoting *Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 535-36 (3d Cir. 1988)). Here, Defendants focus on the first factor, claiming that Baumann's decision to deny Plaintiff's FPIC application was not final because Plaintiff had the right to request a hearing in the Superior Court to review the chief's decision. ECF No. 21 at 20.

Defendants' position improperly conflates the finality and exhaustion requirements while also misinterpreting the chief of police's authority with respect to issuing FPICs. "[T]he finality requirement is concerned with whether the *initial decisionmaker* has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Williamson Cty. Reg. Planning Comm'n v.*

*Hamilton Bank*, 473 U.S. 172, 193 (1985) (emphasis added), *overruled on other grounds by Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162 (2019). In contrast, "the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek *review of an adverse decision* and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Id.* (emphasis added). Here, the "initial decisionmaker"—Baumann—had reached a final decision as to Plaintiff's application. *See* ECF No. 9-5 at 2 (automatic notification informing Plaintiff that his FPIC application "has been denied by the issuing authority"); ECF No. 21-2 at 7 (March 26, 2021 letter from Baumann to Plaintiff stating that the "denial will be finalized" if Plaintiff did not schedule a conference to discuss the decision within 20 days). Although the Supreme Court of New Jersey has not decided this issue explicitly, it has indicated that the chief of police issues "final" decisions as to the approval or denial of an FPIC application. *See Weston v. State*, 60 N.J. 36, 45 (1972) (noting that the "Police Chief" is "the local administrative official charged with responsibility for the original decision to grant or withhold the firearms purchaser identification card" and that the "finality of that decision . . . invests the Chief's action with a quasi-judicial patina or informal adjudicatory character"). That Plaintiff could appeal the denial of his application to the Superior Court pertains to "procedures by which an injured party may seek review of an adverse decision," *Williamson Cty.*, 473 U.S. at 193, an issue of exhaustion that the Court addressed *supra*.

Defendants' reliance on *Almeida v. Conforti*, Civ. No. 16-3411, 2017 WL 626746 (D.N.J. Feb. 14, 2017), is misplaced, as *Almeida* in fact reinforces the conclusion that Baumann's decision in this case was "final." In *Almeida*, the court held that the plaintiff's claim challenging a local police chief's denial of the plaintiff's *handgun permit* application was not ripe because the plaintiff had withdrawn his appeal to the Superior Court. *Id.* at *9. The court reasoned that "the administrative action at issue . . . was not a final determination" because "[o]nly the Superior Court has the authority to issue [handgun] permits." *Id.* With respect to handgun permits, an applicant must first apply to the

local chief of police, and "[i]f the police chief approves the application, 'the applicant shall forthwith present it to the Superior Court of the county in which the applicant resides.'" *Id.* at *2 (quoting N.J.S.A. 2C:58-4(d)). "The Superior Court will then issue the permit 'if, but only if, it is satisfied that the applicant is a person of good character' and meets the same . . . criteria that the police chief was required to consider." *Id.* (quoting N.J.S.A. 2C:58-4(d)). As such, the Superior Court "is the actual issuing authority," and "the police chief's approval or disapproval is . . . merely [a] preliminary step." *Id.* In contrast, with respect to an FPIC application, there is no obligation—on behalf of either the chief of police or the applicant—to submit an application that the chief has approved to the Superior Court. The chief's approval is final and goes into effect without any further steps or the Superior Court's approval. Thus, the basis upon which *Almeida* concluded that a challenge to the denial of a handgun permit application was not ripe is absent in the context of Plaintiff's application for an FPIC.[9]

### D.       Failure to State a Claim

#### *1.       Second Amendment Claim*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees "an individual right to keep and bear arms," 554 U.S. 570, 595 (2008), and this right is "fully applicable to the States." *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). "[A]t the

---

[9] Contrary to Defendants' position, *Durga v. Bryan*, Civ. No. 10-1989, 2011 WL 4594281 (D.N.J. Sept. 30, 2011), does not support dismissal based on prudential ripeness in these circumstances. *Durga* denied a plaintiff's motion seeking summary judgment on his claim that a police chief violated his Second Amendment rights by denying his FPIC and handgun permit applications. *Id.* at *6. The court nevertheless required the police chief to reconsider his denial of the plaintiff's application given irregularities in the review process. *See id. Durga* did not dismiss any claims based on prudential ripeness and is therefore inapposite.

'core' of the Second Amendment is the right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Binderup v. Att'y Gen.*, 836 F.3d 336, 343 (3d Cir. 2016) (quoting *Heller*, 554 U.S. at 634–35). *Heller* therefore invalidated a law that "totally ban[ned] handgun possession in the home" and "require[ed] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." 554 U.S. at 628–29. Interpreting *Heller*, several courts have also recognized a corresponding right to acquire firearms that are otherwise protected under the Second Amendment. *See Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021); *Teixeira v. Cty. of Almeida*, 873 F.3d 670, 677–78 (9th Cir. 2017).

However, the right to keep and bear arms "is 'not unlimited.'" *Binderup*, 836 F.3d at 343 (quoting *Heller*, 554 U.S. at 626). As relevant here, "nothing in *Heller* . . . 'should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill.'" *Beers v. Att'y Gen.*, 927 F.3d 150, 154 (3d Cir. 2019) (quoting *Heller*, 554 U.S. at 626), *vacated on other grounds*, *Beers v. Barr*, 140 S. Ct. 2758 (2020). *Heller* "identified such prohibitions as 'presumptively lawful,' because they affect classes of individuals who, historically, have not had the right to keep and bear arms." *Id.* (quoting *Heller*, 570 U.S. at 627 n.26).

Consistent with other courts of appeals, the Third Circuit applies a "two-pronged approach to Second Amendment challenges." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). First, the Court must determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* "If it does not," the Court "need not proceed to the second step." *Beers*, 927 F.3d at 154. "If it does, however," the Court must "assess the law under heightened scrutiny." *Id.* The law is constitutional if it survives heightened scrutiny, but if not, the law is invalid. *Id.* Here, Plaintiff brings only an as-applied challenge, which requires him to demonstrate that the "application" of the law or policy at issue "under [these] particular circumstances deprive[d] [him] of [his Second Amendment] right.'" *See United States v. Mitchell*,

652 F.3d 387, 405 (3d Cir. 2011) (quoting *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010)).

a)      *Marzzarella* Step One

Since *Marzzarella*, the Third Circuit has developed "a framework for deciding as-applied challenges to gun regulations" pertaining to the categories of individuals who traditionally fall outside the scope of the Second Amendment, such as the "mentally ill." *See, e.g.*, *Binderup*, 836 F.3d at 346; *Beers*, 927 F.3d. at 157. "At step one of the *Marzzarella* decision tree, a challenger must . . . (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Id.* at 347 (citations omitted); *Beers*, 927 F.3d at 157. If the challenger is able to "distinguish his circumstances," then "the burden shifts to the [g]overnment to demonstrate that the regulation satisfies some form of heightened scrutiny . . . at step two of the *Marzzarella* analysis." *Binderup*, 836 F.3d at 347.

"[T]o determine whether a category of people is excluded from the Second Amendment under *Heller*," courts must "'look at the historic, traditional justifications for barring a class of individuals from possessing guns.'" *Doe I v. Governor of Pennsylvania*, 977 F.3d 270, 273 (3d Cir. 2020) (quoting *Beers*, 927 F.3d at 153). With respect to the mentally ill, "the 'historically-barred class[]' . . . . consists of 'individuals who were considered dangerous to the public or to themselves.'" *Id.* (quoting *Beers*, 927 F.3d at 157). In deciding "who is vested with authority to determine that one is a danger to oneself or the public, and on what grounds that person may do so," courts must "defer to the relevant statute's reasonable standards and designations." *Id.* at 273–74.

In *Beers*, the Third Circuit applied this framework to a claim contending that 18 U.S.C. § 922(g)(4) violated the plaintiff's Second Amendment rights as applied. Under section 922(g)(4), it is

24

"unlawful for any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess a firearm. 18 U.S.C. § 922(g)(4). "The Code of Federal Regulations defines 'adjudicated as a mental defective' to include, among other definitions, '[a] determination by a court, board, commission, or other lawful authority that a person, as a result of . . . mental illness . . . [i]s a danger to himself or to others . . . .'" *Beers*, 927 F.3d at 157 (quoting 27 C.F.R. § 478.11). The definition of "committed to a mental institution" is "a '[f]ormal commitment of a person to a mental institution by a court, board, commission, or other lawful authority,' including 'commitment to a mental institution involuntarily' and 'commitment for mental defectiveness or mental illness.'" *Id.* (quoting 27 C.F.R. § 478.11). The plaintiff in *Beers* had been "involuntarily committed to a psychiatric inpatient hospital" in 2005 pursuant to Section 302 of Pennsylvania's Mental Health Procedures Act (MHPA), during which an "examining physician determined that [the plaintiff] was suicidal and that inpatient treatment was required for his safety." *Id.* at 152. A Pennsylvania court extended the plaintiff's involuntary commitment less than a month later, "concluding that he presented a danger to himself or to others." *Id.* However, the plaintiff did not receive any further mental health treatment after 2006, and in 2013, a physician determined that he was able to safely handle firearms without endangering himself or others. *Id.* After being denied the right to purchase a firearm due to his prior involuntary commitment, the plaintiff brought suit claiming that section 922(g)(4) violated his Second Amendment rights as-applied due to his subsequent rehabilitation. *See id.* at 153.

*Beers* denied the plaintiff's Second Amendment challenge. The court reasoned that the plaintiff fell within the category of "individuals who were considered dangerous to the public or to themselves," because he had been "committed involuntarily by [a] Pennsylvania court to a psychiatric hospital in conformity with 27 C.F.R. § 478.11" and state law. *Id.* at 157. The plaintiff therefore fit within the group of mentally ill individuals who were traditionally "outside of the scope

25

of Second Amendment protection." *Id.* Further, the plaintiff was unable to "distinguish his circumstances" from those in this group. *See id.* at 158–59. The only distinguishing features the plaintiff identified were the "passage of time" and "evidence of rehabilitation," which *Beers* held insufficient to distinguish a plaintiff from the "historically-barred class." *See id.*

The Third Circuit extended *Beers* in *Doe I*, which involved a facial challenge to a Pennsylvania statute that prohibits individuals who have been "'committed to a mental institution . . . [under] MHPA [S]ection 302' from possessing firearms." *Id.* at 271 (quoting Pennsylvania Uniform Firearms Act (PUFA) § 6105(c)(4)). Pennsylvania law authorizes involuntary commitment when "'a person is severely mentally disabled and in need of immediate treatment.'" *Id.* at 272 (quoting MHPA § 301(a)). "[A] 'person is severely mentally disabled when, as a result of mental illness, . . . he poses a clear and present danger of harm to others or to himself.'" *Id.* (quoting MHPA § 301(b)). There is a "clear and present danger" to others when a person has attempted to inflict serious bodily harm on another within the past 30 days, and a "clear and present danger" to oneself exists when, in the past 30 days, the individual has attempted suicide, engaged in self-mutilation, or is unable to care for himself such that death or serious injury would ensue imminently. *Id.* (citing MHPA § 301(b)). Applying the standard of deference outlined *supra*, *Doe I* found "no reason to second-guess the adequacy of Pennsylvania's requirement under MHPA § 302 that a physician determine that one is a danger to himself or others as a result of mental illness." *Id.* at 274. Accordingly, the court concluded that a person who "has been involuntarily committed under MHPA § 302" falls within "the class of those historically without Second Amendment rights." *See id.*[10]

---

[10] The plaintiffs in *Doe I* did not bring a direct Second Amendment challenge, but rather claimed that section 922(g)(4) "stripped [them] of a protected liberty interest under the Fourteenth Amendment: their Second Amendment right to bear arms." *Id.* at 273. Having concluded that the plaintiffs fell within the class of mentally ill individuals who traditionally fall outside the Second Amendment's protections, the court held that the plaintiffs failed to establish a protected liberty interest. *Id.* at 274.

Neither the Third Circuit—nor, to this Court's knowledge, any other federal court—has decided whether an individual in Plaintiff's circumstances fits within the class of mentally ill individuals who traditionally fall outside the protections of the Second Amendment. Unlike the plaintiffs in *Beers* and *Doe I*, Rachlin was never involuntarily committed, and a medical professional has not determined that he poses a danger to himself or others. *Compare* Compl. ¶¶ 41, 64 and MTD Ex. D, ECF No. 19-6 at 60–63, *with Beers*, 927 F.3d at 152, 159, *and Doe I*, 977 F.3d at 271–72. However, Plaintiff has a history of depression and self-harm, and neither *Beers* nor *Doe I* held that involuntary commitment or the specific type of dangerousness determinations at issue in these cases are prerequisites for membership in the "historically[-]barred class." *See Beers*, 927 F.3d at 157–59. *Doe I* also held that courts must "defer to the relevant statute's reasonable standards and designations" regarding "*who* is vested with authority to determine that one is a danger to oneself or the public, and on what grounds that person may do so." 977 F.3d at 273–74 (emphasis in original). Here, the relevant statute, which Plaintiff does not challenge on its face as unconstitutional, prohibits granting an FPIC to "any person where the issuance would not be in the interest of the public health, safety or welfare," N.J.S.A. 2C:58-3(c)(5), and the statute assigns the initial determination to the local chief of police. N.J.S.A. 2C:58-3(d)–(e). Pursuant to N.J.S.A. 2C:58-3(c)(5), Baumann determined based on Plaintiff's medical history that granting him an FPIC was not in the interest of public health and safety without a certification from a licensed clinical psychologist attesting to Plaintiff's fitness. Compl. ¶¶ 68, 75. *Beers* and *Doe I* do not resolve whether these circumstances place Plaintiff within the "historically-barred class."

Because this issue is unsettled, I will follow the approach applied in other cases and assume, without deciding, that Plaintiff has demonstrated a burden on his Second Amendment rights. *See, e.g.*, *Mai v. United States*, 952 F.3d 1106, 1114–15 (9th Cir. 2020) (assuming, without deciding, that plaintiff could distinguish himself from the historically-barred class of mentally ill individuals,

thereby establishing a burden on his Second Amendment rights); *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen.*, 910 F.3d 106, 115, 117 (3d Cir. 2018) ("*N.J. Rifle*") (assuming without deciding that a law prohibiting large-capacity magazines burdens Second Amendment rights). I will therefore proceed to assess Plaintiff's claim under heightened scrutiny. *See, e.g.*, *Mai*, 952 F.3d at 1114–15 (applying heightened scrutiny given assumption that the law burdened protected conduct); *N.J. Rifle*, 910 F.3d at 117 (same).

Plaintiff's position that Defendants' policy is "categorically unconstitutional" as applied to him, and therefore not subject to any form of scrutiny, is unavailing. *See* PI Motion, ECF No. 7-1 at 37–42. Under "the law of [the Third] Circuit, . . . the two-step *Marzzarella* framework controls all Second Amendment challenges," which means that courts must apply heightened scrutiny to laws that burden protected conduct. *See Binderup*, 836 F.3d at 356; *see also id.* at 344 (noting that "when faced with an as-applied Second Amendment challenge," courts "agree that some form of heightened scrutiny is appropriate after it has been determined that the law in question burdens protected conduct"). Moreover, the premise underlying Plaintiff's position—that Defendants' policy "completely bar[s] [Plaintiff] from acquiring, owning, or possessing firearms," *id.* at 37—is incorrect. The policy permits Plaintiff to obtain an FPIC if he provides certification from a clinical psychologist that his possession of a firearm will not endanger himself or others. Compl. ¶¶ 56–57. Nothing in Plaintiff's history categorically or permanently prohibits him from obtaining an FPIC under Defendants' policy.[11]

---

[11] *Stokes v. United States Department of Justice*, Civ. No. 19-04613, 2021 WL 3271275 (N.D. Cal. July 30, 2021), to which Plaintiff cites, does not alter this analysis. *Stokes* held only that section 922(g)(4) did not prohibit the plaintiff from possessing firearms because he had never been "adjudicated as a mental defective" or "committed to a mental institution," as the statute requires. *Id.* at **4, 9–10. No Second Amendment claim was before the court in *Stokes*. Here, whether section 922(g) prohibits Plaintiff from possessing firearms is not at issue.

b)        Applicable Form of Scrutiny

Two possible forms of scrutiny may apply to Plaintiff's Second Amendment claim: strict and intermediate. *See United States v. Boyd*, 999 F.3d 171, 188 (3d Cir. 2021). "[L]aws that 'severely burden' the 'core' right of 'law-abiding, responsible citizens to use arms in defense of hearth and home' are subject to strict scrutiny." *Id.* (citing *N.J. Rifle*, 910 F.3d at 115, 117 (quoting *Heller*, 554 U.S. at 628–30)); *Mai*, 952 F.3d at 1115 ("Strict scrutiny applies only to laws that both implicate a core Second Amendment right and place a substantial burden on that right."). "Otherwise, intermediate scrutiny applies." *Id.*

Here, intermediate scrutiny is the appropriate standard. Laws amounting to a "total," "lifetime ban" on firearm possession may place a "substantial" burden on Second Amendment rights. *See Mai*, 952 F.3d at 1115 (quotations omitted); *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 691 (6th Cir. 2016) ("§ 922(g)(4) is a severe restriction[] [because] [i]t permanently prohibits [the plaintiff] from possessing all types of firearms, even in his home."). As discussed *supra*, the policy applied here falls well short of a "total prohibition." *Cf. Mai*, 952 F.3d at 1115 (finding lifetime ban on firearm possession by individual who had been involuntarily committed imposed "substantial" burden). Based on Plaintiff's medical history, Defendants determined that they could not grant an FPIC absent additional information without jeopardizing public health and safety. But Plaintiff would be eligible for an FPIC if a licensed clinical psychologist certifies that Plaintiff's possession of a firearm would not pose a danger to himself or others. *See* Compl. ¶¶ 56–57, 68. Nothing in Plaintiff's medical history categorically disqualifies him from obtaining an FPIC, nor is Plaintiff prohibited from re-applying for an FPIC in the future with proper support.

Moreover, laws that "'appl[y] only to a narrow class of persons, rather than to the public at large,'" typically do not place a "severe" burden on the "core" Second Amendment right. *Boyd*, 999 F.3d at 188 (quoting *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010)); *Tyler*, 837 F.3d at

691 ("§ 922(g)(4) does not burden the public at large; it burdens only a narrow class of individuals who are not at the core of the Second Amendment—those previously adjudicated mentally defective or previously involuntarily committed."). While Plaintiff does not fall within the narrower group of individuals who were involuntarily committed, neither does Defendants' policy apply to "the public at large." *Boyd*, 999 F.3d at 188 (quotations omitted). It applies to Plaintiff—and, conceivably, others who are similarly situated—based on indicia of potential dangerousness in Plaintiff's medical history. Defendants' policy is therefore at least one step removed from the "core" Second Amendment right. *See Mai*, 952 F.3d at 1115 (finding history of mental illness indicating potential "dangerousness" placed individual "well outside the core of the Second Amendment right").

Intermediate scrutiny therefore applies to Plaintiff's claims. *See Md. Shall Issue, Inc. v. Hogan*, --- F.Supp.3d ----, 2021 WL 4750371, at *15 (D. Md. Oct. 12, 2021) (collecting cases applying intermediate scrutiny to regulations that did not severely burden the "core" Second Amendment right).

c)      Application of Intermediate Scrutiny

To survive intermediate scrutiny, a "law must be 'substantially related' or have a 'substantial fit' with an important governmental interest." *Boyd*, 999 F.3d at 188 (quoting *Binderup*, 836 F.3d at 341); *N.J. Rifle*, 910 F.3d at 119 ("[U]nder intermediate scrutiny[,] the government must assert a significant, substantial, or important interest[, and] there must also be a reasonable fit between that asserted interest and the challenged law, such that the law does not burden more conduct than is reasonably necessary."). The law need not be the "least restrictive means of achieving that interest." *N.J. Rifle*, 910 F.3d at 119; *Marzzarella*, 614 F.3d at 85.

Defendants have—at the very least—an "important" interest in preventing suicide and protecting the community from gun violence. *See Washington v. Glucksberg*, 521 U.S. 702, 728–35 (1997) (recognizing that the government has an "unquestionably important" interest in preventing

suicide); *Tyler*, 837 F.3d at 693 (finding interests in "protecting the community from crime and preventing suicide . . . are not only legitimate, they are compelling"); *Mai*, 952 F.3d at 1116 (same); *N.J. Rifle*, 910 F.3d at 119 ("The State of New Jersey has, undoubtedly, a significant, substantial and important interest in protecting its citizens' safety.") (quotations and citations omitted); *United States v. Masciandro*, 638 F.3d 458, 473 (4th Cir. 2011) ("Although the government's interest need not be 'compelling' under intermediate scrutiny, cases have sometimes described the government's interest in public safety in that fashion.").

There is also a "substantial fit" between the "important" governmental interest at stake and Defendants' requirement that a clinical psychologist certify that Plaintiff's possession of a firearm will not endanger himself or others. As other courts have documented, scientific literature establishes that "[f]irearms . . . greatly increase the risk of death by suicide." *See, e.g.*, *Mai*, 952 F.3d at 1116 (citing Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 New Eng. J. Med. 989, 990 (2008) (hereinafter "*Guns and Suicide*")); *Tyler*, 837 F.3d at 695 (acknowledging data showing "that firearms are the most likely method for committing suicide") (citing *Suicide and Self–Inflicted Injury*, Centers for Disease Control & Prevention (Feb. 6, 2015), http://www.cdc.gov/nchs/fastats/suicide.htm)); *see also Guns and Suicide* ("The empirical evidence linking suicide risk in the United States to the presence of firearms in the home is compelling."); Thomas J. Hanlon *et al.*, *Type of Firearm Used in Suicides: Findings From 13 States in the National Violent Death Reporting System, 2005–2015*, 65 J. of Adolescent Health 366 (Sept. 1, 2019) (finding based on CDC data that long guns accounted for more than one quarter of firearm suicide deaths in 13 states between 2005 and 2015). The case law also cites to studies showing a heightened risk of suicide among those with a history of mental illness. Some studies cited in these cases focus on the risk of suicide associated specifically with involuntary commitment. *See, e.g.*, *Mai*, 952 F.3d at 1117–18; *Tyler*, 837 F.3d at 695–96. But the cases also discuss studies demonstrating a heightened risk of

31

suicide among those with a history of mental illness, including depression, who were treated in different settings, such as those who were "'[p]reviously hospitali[z]ed'" and "'[o]utpatients.'" *See Mai*, 952 F.3d at 1118 (quoting E. Clare Harris & Brian Barraclough, *Suicide as an Outcome for Mental Disorders: A Meta-Analysis*, 170 Brit. J. Psychiatry 205 (1997) ("*Suicide Meta Analysis*")); *see also, e.g.*, Nat'l Inst. Mental Health, *Emergency Department Study Reveals Patterns of Patients at Increased Risk for Suicide* (Dec. 19, 2019), https://www.nimh.nih.gov/news/science-news/2019/emergency-department-study-reveals-patterns-of-patients-at-increased-risk-for-suicide (discussing study funded by National Institute of Mental Health finding increased risk of suicide in the year after presentation to emergency department among individuals with depression who have a history of self-harm or suicidal ideation) (citing Sidra Goldman-Mellor *et al.*, *Association of Suicide and Other Mortality With Emergency Department Presentation*, JAMA Network Open (Dec. 13, 2019)).[12]

Defendants have presented records demonstrating that Plaintiff has a history of depression, for which he received mental health treatment, and that he had a history of ███████████ and "███████████████████████" MTD Ex. D, ECF No. 19-6 at 62. Plaintiff also acknowledged that he had seen "a psychiatrist for depression-related issues" and was "prescribed ██████ four years before submitting his FPIC application. Compl. ¶ 41. And when Plaintiff was

---

[12] This document is a "matter[] of public record" that I may consider on a motion to dismiss. *See Pension Ben. Guar. Corp.*, 998 F.2d at 1196; *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (taking judicial notice of "publicly-available documents . . . produced by the [Food & Drug Administration]"); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 207–08 (1st Cir. 2016) (considering Congressional Research Service report, news articles, and press release by state attorney general as "matters of public record"). As with the studies cited in *Mai* and *Tyler*, this study is "not a perfect match for [Plaintiff's] circumstances," *Mai*, 952 F.3d at 1117, as it focuses on individuals who presented to an emergency department, and its findings extend only one year after the individual was discharged. But as the Ninth Circuit concluded in *Mai*, even when a study is "not a perfect match" on account of the limited timeframe it covers, it is reasonable "to predict that the increased risk would not plummet to zero in later years." 952 F.3d at 1117–18.

discharged from ███████ the individuals who evaluated him "[o]ffered to . . . precert[ify]
████████████████████████████ and ██████████████████████████████████
██████████████████████████ " MTD Ex. D, ECF No. 19-6 at 63.[13] Given the close connection

between firearm possession and suicide by individuals with a history of mental illness, there is a

substantial fit between Defendants' interest in preventing suicide and their requirement that Plaintiff

obtain a psychological evaluation confirming that he will not pose a danger to himself or others

through his possession of a firearm.[14]

Though undoubtedly relevant under intermediate scrutiny, that the medical professionals who

evaluated Plaintiff in 2017 determined that he did not pose a danger to himself or others at that time

does not eliminate the fit between Defendants' policy and their governmental interest. The records

---

[13] The cases do note that, according to the literature, "'[s]uicide risk seems highest at the beginning of treatment and diminishes thereafter,'" and the study of those who were involuntarily committed extended only 8.5 years after commitment. *See, e.g.*, *Tyler*, 837 F.3d at 695–96 (quoting *Suicide Meta Analysis*, 170 Brit. J. Psychiatry at 223). *Tyler* therefore struck down a permanent ban on firearm possession as applied to an individual who was involuntarily committed 25 years before he attempted to purchase a firearm, with no subsequent history of mental illness. *See id.* at 699. But the studies following "[o]ut-patients," "[c]ommunity care patients," and those who were "previously hospitali[z]ed," continued for 12, 12, and 15 years, respectively. *See Mai*, 952 F.3d at 1118 (citing *Suicide Meta Analysis*, 170 Brit. J. Psychiatry at 221). Here, although Plaintiff's medical records do not establish precisely when his depression first manifested, it likely occurred within 10 years of his FPIC application ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

[14] Plaintiff's records provide a basis for some concern that his possession of a firearm could endanger others. During his evaluation ████████████, Plaintiff's mother expressed her belief that Plaintiff "has ████████████████████████████████████████████████████████████ ████████ by attempting to rewire the electricity in his bedroom in order to continue using the internet, where he had been posting racially offensive videos, *see id.* at 60, 62, thereby demonstrating a lack of concern for others and their safety. These facts, together with Plaintiff's history of depression and self-harm, are sufficient to render the fit between Defendants' interests and policy substantial, validating their decision to require a psychological evaluation to determine whether Plaintiff's possession of a firearm would pose a danger to himself or others.

show that Plaintiff did in fact have a history of depression, ██████████ and ██████. MTD Ex. D, ECF No. 19-6 at 62. ████████████████████████████████████████████



███████████████ *id.* at 63, which apparently did not occur. *See* Compl. ¶ 41 (acknowledging in his October 2020 FPIC application that Plaintiff had "not dealt with any medical professional related to [his] mental health" since around the time of his admission to ██████████████ when a psychiatrist prescribed █████ that Plaintiff took for several weeks). Baumann therefore could have reasonably concluded that the ████████████ did not necessarily apply with full force in 2021, and he did not possess any information pertinent to Plaintiff's progression since his discharge from ████████ Moreover, the policy Defendants imposed falls well short of permanently prohibiting an individual in Plaintiff's circumstances from possessing firearms, which one court struck down under intermediate scrutiny. *See Tyler*, 837 F.3d at 693, 699. Rather, Baumann indicated that Plaintiff would qualify for an FPIC if he provided certification from a clinical psychologist that his possession of a firearm would not endanger the public or himself.

Plaintiff's position that requiring a clinical psychological evaluation fails intermediate scrutiny because it purportedly burdens more protected conduct than necessary, ECF No. 7-1 at 36, is unavailing. At the outset, it is important to clarify the narrow scope of Plaintiff's challenge. He does not challenge the facial constitutionality of N.J.S.A. 2C:58-3(c)(5), which prohibits granting an FPIC when a chief of police determines that doing so would undermine public health and safety. *See* ECF No. 27. While Plaintiff asserts that he "is not disqualified from possessing a firearm under any provision of New Jersey or federal law," Compl. ¶ 89, he also does not bring a claim or otherwise assert that Baumann exceeded his statutory authority by denying Plaintiff's FPIC application pursuant to N.J.S.A. 2C:58-3(c)(5). Nor does Plaintiff bring a claim alleging that Baumann exceeded his statutory authority to "investigate [an FPIC] application to determine whether or not the applicant

has become subject to any of the disabilities set forth" by statute, which includes section 2C:58-3(c)(5). *See* N.J.S.A. 2C:58-3(e).[15] Rather, Plaintiff argues only that requiring him to provide certification from a clinical psychologist, based on his specific circumstances, fails intermediate scrutiny due to the time and expense involved.

Neither party cites to any authority addressing the precise burden at issue here, and this Court is not aware of any either, but cases addressing other types of burdens on Second Amendment rights offer some guidance. Courts have held that waiting periods before obtaining a firearm permit are constitutional under intermediate scrutiny. *See, e.g.*, *Sylvester v. Harris*, 843 F.3d 816, 827–29 (9th Cir. 2016) (upholding 10-day "cooling off" period before granting permit to individuals who had already passed a background check); *Md. Shall Issue*, 2021 WL 4750371, at **25–26 (holding that the time associated with completing classroom and live-fire training as prerequisites to obtaining a firearm permit withstand intermediate scrutiny). Courts have also upheld "reasonable" fees associated with obtaining a firearm permit. *See, e.g.*, *Heller v. District of Columbia*, 801 F.3d 264, 278 (D.C. Cir. 2015) ("*Heller II*") (holding "reasonable fees associated with the constitutional requirements of registration and fingerprinting are also constitutional"); *Kwong v. Bloomberg*, 723 F.3d 160, 165–69 (2d Cir. 2013) (holding constitutional a $340 fee for a handgun license); *Md. Shall Issue*, 2021 WL 4750371, at **7, 25–26 (holding expense of at least $200, which includes the cost

---

[15] Plaintiff does correctly note that, contrary to Defendants' assertion, N.J.S.A. 2C:58-3(e) does not explicitly authorize an issuing authority to require FPIC applicants to provide a psychological evaluation as part of their applications. *See* MTD, ECF No. 19-3 at 25; ECF No. 27 at 35–36. But again, Plaintiff does not bring a claim for a statutory violation, and certain New Jersey state court cases recognize that other police departments have imposed such a requirement without questioning their authority to do so. *See, e.g.*, *In the MATTER OF the Appeal of the Denial of D.P.'s Application for a Firearms Purchaser Identification Card and a Handgun Purchase Permit*, No. A-0545-19, 2021 WL 1731790 (N.J. Super. Ct. App. Div. May 3, 2021) (recognizing that FPIC applicant had failed to submit psychological evaluation, as requested by chief of police, and upholding FPIC denial pursuant to N.J.S.A. 2C:58-3(c)(3) and (5) because applicant failed to disclose prior psychiatric treatment).

of a training course required to obtain firearm permit, is constitutional). These cases of course do not precisely match the burden Defendants imposed on Plaintiff. Although the expense associated with obtaining a psychological evaluation was part of the cost of reviewing Plaintiff's FPIC application, unlike the fee at issue in *Kwong*, it does not strictly "defray" the cost to the Township of issuing a permit. *See* 723 F.3d at 165.

But the burden Defendants imposed is commensurate with the risks Plaintiff's circumstances present. Unlike the burdens imposed in the cases cited *supra*, Defendants' requirement that Plaintiff provide certification from a clinical psychologist is not a baseline standard applicable to the public at large. It applies only in the narrower circumstances at issue here, which call into question whether Plaintiff's possession of a firearm would endanger himself or others based on his history of self-harm and treatment for depression. Moreover, in the context of other constitutional rights, courts have upheld financial and temporal burdens analogous to those Defendants imposed in evaluating Plaintiff's FPIC application, at least when connected to a substantial governmental interest. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms: An Analytical Framework*, 56 U.C.L.A. L. Rev. 1443, 1544 (2009) (observing that "regulations of the right to abortion are not rendered unconstitutional simply because they increase the cost of an abortion," as the Supreme Court held "when upholding viability testing requirements") (citing *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 517–20 (1989) (plurality opinion); *id.* at 529–30 (O'Connor, J., concurring in part and concurring in the judgment)); *see also* Volokh, *Implementing the Right to Keep and Bear Arms*, at 1544 (explaining that the Court also "uph[eld] a 24-hour waiting period even though it required some women in states with very few abortion providers to stay in a hotel overnight or miss a day of work") (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 886 (1992) (plurality opinion of O'Connor, Kennedy, and Souter J.J.)). And given the heightened dangers associated with firearm ownership, courts recognize that "[s]tate regulation under the Second Amendment has always been

more robust than of other enumerated rights." *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 100 (2d Cir. 2012).

Plaintiff also largely overstates the burden Defendants imposed. He allegedly obtained a quote from one clinical psychologist for $2,500, but he does not state whether insurance would cover a portion of the cost, and in any event, he identified several other in-network psychologists within close proximity to his home from whom he evidently could have obtained an evaluation. *See* Compl. ¶ 70. He does not allege that obtaining an evaluation from any of these providers would have been financially burdensome. While he claims that these psychologists were unable to schedule an appointment within his desired timeframe due to the COVID-19 pandemic, *id.*, he does not cite to any authority holding that such a delay would unnecessarily burden his Second Amendment rights.

Nor does Faiman's letter render the burden Defendants' policy imposed greater than necessary to effectuate their substantial governmental interest in preventing gun violence. Even if obtaining a letter from Faiman is less burdensome than undergoing an evaluation by a clinical psychologist, under intermediate scrutiny, Defendants need not demonstrate that their policy is the "least restrictive means of serving that interest." *N.J. Rifle*, 910 F.3d at 119; *Marzzarella*, 614 F.3d at 85. Plaintiff also has not established that Faiman's letter provides adequate assurance that his possession of a firearm will not endanger himself or others. In New Jersey, an LPC "with the designation of clinical mental health counselor" is authorized to preliminarily diagnose "mental and emotional disorders." N.J.S.A. 45:8B-44(a). But a designation as a "clinical mental health counselor" requires qualifications beyond those necessary for licensure as an LPC, *see* N.J.S.A. 45:8B-44(b), and Faiman's letter does not specify whether he is certified as a "clinical mental health counselor." It was therefore reasonable for Baumann not to accept Faiman's assessment, as his letter provides no indication that he is qualified to issue such an opinion. Faiman also did not provide any explanation of the specific type of evaluation he conducted or the methods he used. *See* Compl. ¶ 63 (stating that

Faiman conducted a "formal safety assessment" without providing any additional details). Other than Plaintiff's own "description of his success in the later years of high school," Faiman did not specify the sources on which he relied or any accepted tests he utilized, and he even acknowledges that he did not have insight into any "safety concerns" related to Plaintiff during the previous four years. *Id.* Faiman's description of his March 2021 evaluation is one paragraph, and he appears to rely heavily on the fact that Plaintiff had entered college, which is hardly dispositive of Plaintiff's fitness to possess firearms. On this record, given Plaintiff's history of mental health treatment at a relatively young age, the Court is unable to conclude that Faiman's letter demonstrates that Defendants burdened more protected conduct than necessary.

In reaching this conclusion, "[n]othing in [this Opinion] should be read as perpetuating the stigma surrounding mental illness." *Beers*, 927 F.3d at 159. As Plaintiff notes, "mental health counseling [i]s widely accepted and utilized throughout the United States." MPI, ECF No. 7-1 at 32. This Opinion holds only that based on Plaintiff's medical history, including prior incidents of self-harm and treatment for depression, there is a substantial fit between Defendants' policy and their important interest in preventing suicide and gun violence. For that reason, Defendants' policy is constitutional as applied to Plaintiff.[16]

Finally, Plaintiff's position that Defendants violated his Second Amendment rights due to alleged delays in processing his FPIC application is without merit. Administrator Valesi explained

---

[16] Before granting injunctive relief, courts must consider "'the possibility of harm to other interested persons from the grant or denial of the injunction'" and "'the public interest.'" *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). If I were to consider Plaintiff's PI Motion, many of the facts discussed *supra*, including Plaintiff's history of depression and self-harm as well as his parents' concerns regarding the risks he poses to others, would weigh heavily against granting an injunction, and I would be free to consider other facts pertinent to whether granting the requested relief would be in the public interest.

that the Township was experiencing delays in completing the requirements associated with processing FPIC applications due to the "unprecedented" volume it had received during the COVID-19 pandemic. *See* Compl. ¶ 48. He notified Plaintiff that as of mid-January 2021, the Township was processing applications submitted in November 2020 and that Plaintiff's application was "being 'worked on'" at that time. *Id.* ¶ 49. Plaintiff does not cite to any authority holding that delays beyond a statutorily required processing period—or, more generally, that the amount of time taken to process Plaintiff's application—violate the Second Amendment. Indeed, the Superior Court of New Jersey, Appellate Division, has held that no statutory violation occurs when an issuing authority takes longer than 30 days to process an application due to delays in completing application requirements, as the delays provide "good cause" for withholding a permit until the investigation is complete. *See Adler v. Livak*, 308 N.J. Super. 219, 223–25 (App. Div. 1998) (no statutory violation where FPIC processing period exceeds 30 days due to delays in receiving fingerprint reports from State Bureau of Investigation and FBI). And Plaintiff, in fact, does not bring a separate count alleging that Defendants violated N.J.S.A. 2C:58-3(f) by exceeding the statutory deadline.

Accordingly, Plaintiff has failed to state a claim under the Second Amendment, and his Second Amendment claims against Baumann and the Township[17] are dismissed.

### 2.    First Amendment Claim

"'[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). To state a claim for First Amendment

---

[17] Because I conclude that Plaintiff failed to state a claim under the Second Amendment, I do not reach the issue of whether the Township is subject to liability under section 1983 pursuant to *Monell*, as *Monell* liability attaches only when accompanied by an underlying "deprivation of rights." 436 U.S. at 690.

retaliation, "a plaintiff 'must [plausibly allege] (1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation.'" *George v. Rehiel*, 738 F.3d 562, 585 (3d Cir. 2013) (quoting *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir.2004)). "Causation in this context is defined as 'but-for causation, without which the adverse action would not have been taken.'" *Brantley v. Wysocki*, 662 F. App'x 138, 142 (3d Cir. 2016) (quoting *Hartman*, 547 U.S. at 260). On a Rule 12(b)(6) motion to dismiss, "an obvious alternative explanation" for the defendant's conduct "negates any inference of retaliation." *See Rehiel*, 738 F.3d at 586 (citing *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir.2010)).

Here, Plaintiff's First Amendment retaliation claim fails because an "obvious alternative explanation" for Baumann's decision to deny Plaintiff's FPIC application "negates any inference" that Baumann reached this decision in retaliation against Plaintiff's protected speech. *Rehiel*, 738 F.3d at 586. Plaintiff submitted his FPIC application on October 24, 2020. Compl. ¶ 4. In response to the perceived delay in processing his application, Plaintiff first spoke out against the Township via *Reddit* on February 9, 2021, and he voiced his criticism again at a Town Council meeting on February 23, 2021. *Id.* ¶¶ 50, 52–53. On February 26, 2021, shortly after that meeting, Baumann notified Plaintiff that his application was effectively approved and would be complete in several days. *Id.* ¶¶ 54–55. However, on March 2, Officer Winowski submitted his report to Baumann recommending that the FTPD grant Plaintiff's application while also noting Plaintiff's records from ▮▮▮▮ documenting, *inter alia*, his history of ▮▮▮▮ and ▮▮▮▮ as well as his diagnosis with ▮▮▮▮rder. Paltzik Decl. Ex. 1, ECF No. 27-3 at 10–12. The following day, Baumann notified Plaintiff that a clinical psychologist would need to provide certification before the FTPD could grant Plaintiff's application. Compl. ¶¶ 56–57. Based on this chain of events, Baumann was in fact prepared to *approve* Plaintiff's application shortly after he engaged in protected speech

against the Township. Moreover, Baumann reversed course only—and immediately—after Winowski presented Plaintiff's medical records demonstrating his history of ██████ and ███ ███ which provides an "obvious alternative explanation" for Baumann's decision. *Rehiel*, 738 F.3d at 586. Plaintiff is therefore unable to plausibly allege that, "but-for" his protected speech, *Brantley*, 662 F. App'x at 142, Baumann would not have required certification from a psychologist and ultimately denied his FPIC application.

Accordingly, Plaintiff's First Amendment retaliation claim against Baumann and the Township is dismissed.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED**, and Plaintiff's Motion for a Preliminary Injunction is **DENIED** as moot. An appropriate form of Order is filed herewith.

Date: February 22, 2022                                      /s/ Freda L. Wolfson
                                                            Hon. Freda L. Wolfson
                                                            U.S. Chief District Judge